MARVIN J. WARREN, Plaintiff-Appellee, v. MARCIA H. WARREN, Defendant-Appellant.

Fifth District   No. 5—87—0343

Opinion filed May 10, 1988.

John E. Rhine, of Fowler, Rhine, Cawley & Ernest, of Mt. Carmel, for appellant.

George W. Woodcock, of Woodcock, Kline & Kaid, of Mt. Carmel, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Defendant, Marcia H. Warren, appeals from the circuit court's judgment that the antenuptial agreement between her and plaintiff, Marvin J. Warren, was valid and fully enforceable. Specifically, Marcia contends that the antenuptial agreement she and Marvin entered into is either void as against public policy or unfair, unreasonable and unconscionable in that it gave her no rights to marital property, maintenance, or attorney fees upon dissolution. The facts are as follows.

Marvin and Marcia met in 1974 when Marcia went to work as a part-time secretary for the Southern Triangle Oil Company. Marvin was president and one-third owner of the oil company. A few months after they met, Marcia and Marvin began dating. After sensing friction with other employees over her relationship with Marvin, Marcia quit and went to work as a secretary for the International Association of Machinists and Aerospace Workers. Marvin and Marcia continued

dating until 1978, when they began living together "off and on." In 1979 they lived together on a continuous basis until their marriage on March 13, 1982. The marriage lasted for about five years. Marvin was 63 years old at the time of dissolution; Marcia was 42.

On January 19, 1982, Marvin and Marcia entered into an antenuptial agreement which provided that since Marvin and Marcia were each self-sufficient financially (Marvin's net worth was set at $7 million; Marcia's net worth was set at $70,000), neither party would be entitled to property "now or hereafter acquired" by the other upon dissolution, nor would either party be entitled to maintenance or attorney fees from the other upon dissolution.

Marcia testified that in March 1981 Marvin asked her to quit her job so that she could take care of him. Marcia complied with this request and did not work outside of the home thereafter. Marcia further testified that during the marriage Marvin threatened to divorce her if she went back to work. Marvin's testimony indicates that he acquiesced in Marcia's decision to quit her employment. According to Marcia, she and Marvin held themselves out to the public as husband and wife in 1980. Although Marvin denied it and their children testified that they knew Marvin and Marcia were not married during the period of cohabitation, six letters from Marvin's relatives addressed to "Mr. and Mrs. Marvin Warren" dated prior to the marriage were admitted into evidence.

The parties discussed entering into an antenuptial agreement during the fall of 1981. Both parties admit that Marvin would not marry Marcia without the agreement. While there is some dispute as to when Marcia was presented with the agreement for signature, it is undisputed that Marcia never took the agreement to an attorney for independent legal counsel prior to or after signing it. Marvin testified that he told Marcia to seek independent legal counsel. Both parties agree that Marvin's attorney, George Woodcock, prepared the agreement and explained its meaning to Marcia prior to its execution.

Marcia testified that she was very upset with having to execute the agreement and was crying along the way to the attorney's office. According to Marcia, Marvin reassured her by saying that such an agreement was routine for someone of his financial status and that he would always take care of her. Judith Lewis and Carolyn Keepes, legal secretaries for George Woodcock, testified that Marcia appeared to be in good spirits when the agreement was executed. Marvin testified that Marcia appeared to fully understand the tenor of their agreement. Although the agreement set forth an approximate valuation of assets owned by the parties, Marvin's considerable assets were

set forth in very general terms (*i.e.*, one-third interest in Southern Triangle Oil Company, stocks, house, mobile home, numerous automobiles, boat, personal property). Marvin admitted that he owned individual interests in oil properties and oil drilling equipment which were not listed in the agreement. Marvin testified that Marcia was aware of these assets by virtue of her employment with the oil company and living with him; Marcia testified that she was not.

At the time of trial Marvin testified that he was worth $1½ to $2 million, with over $700,000 in debts; Marcia testified that she was worth approximately $32,539 ($1,039 in cash; $1,500 certificate of deposit; $30,000 house). There is some dispute as to the manner in which Marvin's assets were valued. We also note that while Marcia was collecting $350 per month rent from her house during the marriage, no account was given as to this money other than Marcia's testimony that she used some of it to supplement the money Marvin gave her to run the household. Marcia testified at the time of trial that she was unemployed.

During the period of cohabitation and the marriage, Marcia's children lived with her and Marvin, with Marvin furnishing all of their support. The child support money paid by Marcia's first husband was put into the bank as a college fund for the children. During the marriage Marvin paid off Marcia's house and paid for her eldest child's (Mark's) college education. Marvin also bought a Pontiac Grand Am automobile for Mark, a GMC van for Marcia, and a Chevrolet Blazer. He also bought a $350,000 house. The automobile, the van and the Blazer were titled jointly to Marvin and Marcia; the deed to the house was in Marvin's name only.

After hearing evidence, the circuit court found the antenuptial agreement was fair, reasonable, and not contrary to public policy. In doing so, the court noted that Marcia, a woman who had held responsible positions in the business world (*i.e.*, airline stewardess, secretary for a coal company, legal secretary, bank teller, oil company secretary, and a district secretary for the machinists union), had ample opportunity to consult an attorney regarding the agreement and chose not to do so. Furthermore, the court noted that Marvin had bequeathed $100,000 to Marcia in his will prior to the execution of the agreement. In addition to the property she brought into the marriage, Marcia was awarded an interest in the vehicles titled to her and Marvin and an interest in several small items of personal property.

Although an agreement executed during the marriage which modifies the legal duties of married people to one another may be void against public policy (*Warner v. Warner* (1908), 235 Ill. 448, 85

N.E. 630; *Laleman v. Crombez* (1955), 6 Ill. 2d 194, 127 N.E.2d 489), antenuptial agreements determining the rights of spouses to property (Ill. Rev. Stat. 1985, ch. 40, par. 503; *In re Marriage of Burgess* (1984), 123 Ill. App. 3d 487, 463 N.E.2d 203), or maintenance (*In re Marriage of Burgess* (1985), 138 Ill. App. 3d 13, 485 N.E.2d 504) are valid and enforceable so long as (1) an unforeseen condition of penury is not created due to lack of property resources or lack of employability (138 Ill. App. 3d at 15, 485 N.E.2d at 505-06), (2) the agreement is entered into with full knowledge and without fraud, duress, or coercion (*Volid v. Volid* (1972), 6 Ill. App. 3d 386, 392, 286 N.E.2d 42, 47), and (3) the agreement is fair and reasonable (*Eule v. Eule* (1974), 24 Ill. App. 3d 83, 87, 320 N.E.2d 506, 509).

■ Although Marcia claims that she entered into the agreement under conditions of stress and coercion, the record shows (1) that Marvin encouraged her to seek independent legal counsel, (2) that the marriage did not take place until about two months after the agreement was executed, and (3) that Marcia appeared to be in good spirits at the time of execution. Under these circumstances, the circuit court properly could have found that the agreement was made in the absence of duress or coercion.

■ Although Marcia claims that she did not understand the precise terms of the agreement when she signed it, or know the full extent of Marvin's financial holdings, the record shows (1) that she had ample opportunity to seek legal counsel between the time of execution and the marriage, (2) that Marcia had the agreement explained to her prior to signing it, and (3) that Marcia was not inexperienced in the ways of the business world. Moreover, while Marvin did not set forth the exact nature of the property he owned in the agreement, he did set forth that he was a multimillionaire and gave a general recital of the source of his wealth. Furthermore, Marvin testified that Marcia was aware of other property he owned through working for the oil company and living with him. Under these circumstances, the circuit court could properly have found that the agreement was made with full knowledge. Since any fraud allegation would have to include lack of knowledge on the part of the injured party, the court properly could have found fraud to be absent.

■ Although Marcia's assets are modest in comparison to Marvin's, they are sufficient to keep her from sinking into an imminent condition of penury. Moreover, while Marcia was unemployed at the time of trial, the fact that she voluntarily quit her employment about one year prior to the marriage could make her lack of future employability foreseeable. Thus, the circuit court properly could have found

that Marcia would not be reduced to a state of penury as a result of the dissolution.

Although marriage is sufficient legal consideration for an antenuptial agreement (*Guhl v. Guhl* (1941), 376 Ill. 100, 33 N.E.2d 185), the agreement must be fair and reasonable. Illinois requires that an antenuptial agreement guarantee both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance. (*Eule v. Eule* (1974), 24 Ill. App. 3d 83, 87, 320 N.E.2d 506, 510.) In *Eule*, the parties entered into an agreement which provided, *inter alia*, that neither spouse would be entitled to support or temporary alimony if the marriage broke down within seven years of the date of their wedding. The trial court refused to enforce this provision and awarded the wife temporary alimony. On appeal, the appellate court affirmed the trial court's determination. In doing so, the court noted that while *Volid v. Volid* (1972), 6 Ill. App. 3d 386, 286 N.E.2d 42, indicates that a trial court may be bound to enforce a total waiver of temporary alimony and support, the *Volid* court upheld the waiver therein primarily because the generous provision contained in the antenuptial agreement ($50,000 lump sum payment if the dissolution decree was entered three years after marriage) probably would have provided more support than a court would have mandated absent an agreement. *Eule*, 24 Ill. App. 3d at 88, 320 N.E.2d at 510.

Although *Eule* expressed no opinion regarding the validity of a clause which attempts to waive permanent alimony, the equities considered in *Eule* must be considered here. In doing so we note: (1) that the agreement provides no financial settlement whatsoever for Marcia; and (2) that for several years Marcia and Marvin lived a lifestyle far more extravagant than Marcia could hope to afford on her own. While Marcia was aware of the nature and extent of Marvin's property and waived her rights thereto with full knowledge, we conclude that the provision for total waiver of Marcia's right to maintenance is not fair and reasonable due to Marcia's financial circumstances. We note that the total waiver of maintenance without an antenuptial financial settlement upheld by the court in *In re Marriage of Burgess* (1985), 138 Ill. App. 3d 13, 485 N.E.2d 504, is distinguishable because the aggrieved party therein was worth over $412,000 and had yearly investment income of over $38,000. Moreover, since Marvin instituted the instant proceedings and is in a far superior position financially than Marcia, the provision that each party pay their own attorney fees upon dissolution is not fair and reasonable. We note the trial court's decision as to attorney fees on the merits was made without Marcia being given the opportunity to present evidence.

For the foregoing reasons, the trial court's determination that the antenuptial agreement was valid and enforceable must be reversed as to the maintenance provision, with the cause remanded for a determination of a fair and reasonable amount of maintenance. The trial court must also reconsider Marcia's request for attorney fees.

Reversed and remanded.

KARNS and LEWIS, JJ., concur.