636 So.2d 87 (1994)
Barbara K. KOLFLAT, Appellant/Cross-Appellee,
v.
Tor D. KOLFLAT, Appellee/Cross-Appellant.
No. 93-01094.
District Court of Appeal of Florida, Second District.
March 30, 1994.
Rehearing Denied April 21, 1994.
*88 J. Christopher Lombardo and Anne Rocco Prickett, Woodward, Pires & Anderson, P.A., Naples, for appellant.
John R. Asbell and Victoria M. Ho, Asbell, Hains, Doyle & Johnson, P.A., Naples, for appellee.
PER CURIAM.
Barbara Kolflat appeals the final judgment of dissolution of her marriage to Tor Kolflat. She contends the trial court erred in enforcing the parties' antenuptial agreement, in which she waived all right to financial support from Tor if the parties divorced. We hold that the agreement should not have been enforced with regard to Barbara's total waiver of alimony.
Tor cross-appeals the final judgment, contending the trial court erred in denying his request for credits against the distribution made to Barbara for temporary support. We reject this contention because those payments were made pursuant to a stipulation signed by Tor.
Barbara and Tor met in September of 1979 while Barbara was living in Springfield, Illinois, and Tor was living in Chicago, which is four hours away. They engaged in a longdistance relationship until the following March, when Tor asked Barbara to marry him the day after his acrimonious and protracted divorce from his previous wife became final. Barbara agreed to do so and they set a wedding date for one week later. During the week prior to the wedding, Tor presented Barbara with the antenuptial agreement at issue. The parties' testimony is conflicting regarding whether they had ever discussed entering into an antenuptial agreement, when Barbara learned of the terms of the antenuptial agreement, how she felt about those terms, and whether she made any attempt to alter them. The parties' testimony is not conflicting regarding the fact that Barbara knew the terms of the agreement when she signed it.
The antenuptial agreement, which was dated March 27, 1980, acknowledged that Barbara was thirty-seven years of age at the time and had three children, two of whom were minors. The agreement recited that Barbara's gross income for 1979 was $15,000, and that her estate consisted of no savings or checking accounts, one-half interest in a cabin, ownership of a car, patio furniture, a piano, a townhouse in Springfield, and participation in a state retirement plan.[1]
The antenuptial agreement acknowledged that Tor was fifty-four years of age at the time and had four adult children. His gross income for 1979 was $780,000 and his estate consisted of a checking and a savings account, U.S. Treasury Bills, twenty-five municipal bonds, real estate in Snowmass, Colorado, and income and other benefits from the engineering firm from which he had retired. The agreement did not set forth the value of Tor's estate or any of its components.
The antenuptial agreement provided that both Barbara and Tor waived, released, and quitclaimed all right, title, and interest they might acquire as wife and husband in and to all property and estate now owned or thereafter acquired by the other. The agreement also provided that both Barbara and Tor waived and released their rights to temporary or permanent alimony, maintenance, and support from the other.
After the parties married, Barbara sold her townhouse and liquidated her retirement account and contributed the proceeds to the parties' joint checking account. She also left her job and stayed at home with her daughter, an arrangement Tor indicated was acceptable. Barbara did not work during the marriage, except to engage in some part-time modeling. Tor did not work either.
During the marriage, the parties lived an affluent lifestyle. The homes they lived in were valued at several hundreds of thousands of dollars, they belonged to several country clubs, and they traveled around the country. Barbara's children received $43,000 from Tor in the form of gifts, allowances, college tuition, and wedding expenses. Shortly after the parties married, Tor *89 amended his will to make Barbara a fifty percent beneficiary of his estate.
In January 1992, Tor filed a petition for dissolution of marriage requesting that the antenuptial agreement be enforced. The trial court first held a hearing to determine the validity of the agreement. It determined the agreement was valid based on its findings that Barbara had knowledge of Tor's separate assets before executing the agreement; she executed the agreement freely and voluntarily with the advice of her own counsel; the agreement is not a product of fraud, duress, or coercion; and Barbara owned assets of approximately $29,000 at the time of the marriage and at the time of the final hearing she had assets of over $109,000. The court also found that the agreement provided that Illinois law would control its interpretation.
The trial court then conducted a hearing on the petition for dissolution. It granted the petition, making the following provisions: each party was to receive the property titled in his or her name; each party was to receive specified furniture; and Barbara was to receive one-half the value of the parties' $37,500 boat, as well as one-half the value of the parties' joint bank account, which amounted to $496.00. Tor's request for credits against the $36,348.94 in payments of alimony, country club expenses, and dental bills during the pendency of the proceedings was denied. Barbara was ordered to vacate the marital home.
By this appeal, Barbara contends the trial court abused its discretion in enforcing the antenuptial agreement because it does not meet the following test for validity under Illinois law:
[A]ntenuptial agreements determining the rights of spouses to property or maintenance are valid and enforceable so long as (1) an unforeseen condition of penury is not created due to lack of property resources or lack of employability, (2) the agreement is entered into with full knowledge and without fraud, duress, or coercion, and (3) the agreement is fair and reasonable.
Warren v. Warren, 169 Ill. App.3d 226, 119 Ill.Dec. 924, 927, 523 N.E.2d 680, 683 (1988). We agree with Barbara insofar as we hold that the Kolflats' antenuptial agreement does not satisfy the third prong of the test. The antenuptial agreement in Warren was also held to not satisfy the requirement of being fair and reasonable, and the facts of that case are very similar to those of this case.
Marvin and Marcia Warren were twenty-one years apart in age, and they cohabited for approximately three years prior to marrying. They executed an antenuptial agreement whereby they relinquished their rights to maintenance and attorney's fees upon dissolution. Prior to executing the agreement, Marvin bequeathed $100,000 to Marcia in his will. The agreement stated Marvin's net worth to be $7 million and Marcia's net worth to be $70,000. The agreement only set forth an approximate valuation of the parties' respective assets.
The Warrens were married for five years, during which time they lived in a $350,000 house and Marcia did not work outside the home. In addition, Marvin paid off Marcia's house and bought her and her son cars, and paid for her son's college education. Marvin also supported Marcia's children during the parties' cohabitation and marriage. At the time of trial, Marvin's assets were valued at $1.5 to $2 million, with over $700,000 in debts, and Marcia's assets were valued at $32,539.
The Illinois circuit court upheld the Warrens' antenuptial agreement, and Marcia appealed. Applying the first prong of the test for validity of an antenuptial agreement, the Illinois appellate court held that although Marcia's assets were modest in comparison to Marvin's, they were sufficient to prevent her subjection to an unforeseen condition of penury. In so holding, the court noted that Marcia's voluntary resignation from her job prior to the marriage could have made her lack of future employability foreseeable.
Applying the second prong of the test, the Illinois appellate court held that Marcia did not enter into the agreement under fraud, duress, or coercion. Specifically, it noted that Marvin encouraged Marcia to consult an attorney and Marcia had over two months between the time the agreement was executed and the date of the marriage to do so. *90 Marcia did not consult an attorney, but Marvin's attorney explained the terms of the agreement to her before she signed it, and she did so in good spirits.
The court further held that the agreement was made with full knowledge as Marcia was not inexperienced in the ways of the business world and, although Marvin did not set forth the exact nature of the property he owned, he had set forth in the agreement that he was a multimillionaire. In addition, Marvin testified that Marcia was aware of his property holdings through living with him and having worked with him at one time.
Applying the third prong of the test, the Illinois appellate court held that the Warrens' agreement was not fair and reasonable. In so holding, it noted that although marriage is sufficient legal consideration for an antenuptial agreement, "Illinois requires that an antenuptial agreement guarantee both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance." 119 Ill.Dec. at 927, 523 N.E.2d at 683. Although Marcia waived her right to maintenance and any share of Marvin's property with knowledge of the extent of Marvin's estate, the court held that the waiver was not fair and reasonable in light of the facts that the agreement provided absolutely no financial settlement for Marcia and she and Marvin had lived a far more extravagant lifestyle than she could hope to live on her own.
Warren requires reversal of this case. As in Warren, Barbara Kolflat's assets of over $109,000 may be considered modest in comparison to Tor's net worth of just over $4.7 million. However, they are even more sufficient than were Marcia Warren's assets to prevent Barbara from falling into penury.
Also as in Warren, the evidence does not reveal that Barbara entered into the antenuptial agreement without knowledge and as a result of fraud, duress, or coercion. Although the parties' testimony is conflicting regarding the extent of Barbara's knowledge of Tor's assets, Barbara testified that Tor told her he had signed a $1.2 million check in settlement of the dissolution proceeding with his ex-wife and that represented sixty percent of his estate. She also testified that she drove by Tor's house in Winnetka, Illinois, a suburb she knew to only contain expensive homes, and assumed the house was worth about $300,000. Thus, the evidence supports the trial court's finding that Barbara had knowledge of Tor's assets when she executed the antenuptial agreement.
The evidence also supports the trial court's finding that Barbara executed the agreement freely and voluntarily. Barbara testified that she would have signed the agreement regardless of its terms and even if Tor had been worth $100 million. In addition, Barbara did present the agreement to an attorney at Tor's suggestion and she received and read the attorney's opinion letter on the agreement prior to executing it.
Although the Kolflat antenuptial agreement satisfies the first two prongs of the test of validity, it does not meet the requirement of being fair and reasonable. As in Warren, the agreement provides absolutely no financial support for Barbara, and Barbara and Tor lived a far more extravagant lifestyle than Barbara could hope to afford on her own. Even more compelling are the facts that Barbara and Tor were married for approximately eight more years than were the Warrens; and Barbara, who is now fifty and does not have a college education or any specific work skills, has been out of the work force for a much longer period than was Marcia Warren. In addition, Marcia Warren had more diverse work experience than Barbara, whose work experience as a secretary for numerous political offices in Illinois was the result of her political ties in that state.
Thus, because the parties' antenuptial agreement was not fair and reasonable with regard to the alimony provision, we must reverse and remand for a determination of an appropriate amount of alimony for Barbara. The trial court's denial of Tor's request for credits is affirmed.
Reversed in part and remanded with directions.
DANAHY, A.C.J., and ALTENBERND and LAZZARA, JJ., concur.
NOTES
[1] Barbara testified that her income in 1979 was actually $18,000, and that she did have savings and checking accounts but neither contained more than a couple of thousand dollars.