NO. 4-00-0990

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of ) Appeal from

SANDRA K. BARNES, ) Circuit Court of

Petitioner-Appellant, ) McLean County

and ) No. 99D19

EDWARD H. BARNES, )

Respondent-Appellee. ) Honorable

) James E. Souk,

) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

Shortly before their marriage in July 1991, Sandra and Edward Barnes executed a premarital agreement (Agreement).  Both parties were represented by separate counsel.  The Agreement defined the parties' rights on the issues of property and maintenance in the event of a divorce.  At all times relevant here, Edward was the sole shareholder and chief executive officer (CEO) of Glass Specialty Company, Inc.  He earns in excess of $250,000 per year and enjoys various perks, including use of the company plane and vehicles.  Shortly after the marriage, Sandra quit her office job (earning $19,000 per year) to be able to travel with and spend more time with Edward.

Sandra and Edward separated in December 1998.  Sandra filed for divorce on January 14, 1999.  Sandra and Edward have no children together.  Sandra appeals from the trial court's judgment enforcing the terms of the Agreement.  She also asserts that the trial court improperly compelled privileged testimony and failed to award her adequate attorney fees.  We affirm. 

I. PREMARITAL AGREEMENTS IN ILLINOIS

Illinois law relating to premarital agreements has gradually evolved to permit agreements that define rights and obligations upon divorce.  Historically, premarital agreements controlled the devolution of the parties' property upon death, not upon divorce.  1 H. Clark, Domestic Relations §1.9, at 48 (2d ed. 1987).  In fact, premarital agreements that attempted to limit spousal maintenance or distribute property upon divorce were invalidated on public policy grounds because they were said to be conducive to divorce.  1 H. Clark, Domestic Relations §1.9, at 49, 53 (2d ed. 1987).  

That same rationale was used to invalidate 
postnuptial
 agreements regarding maintenance awards or property distribution that were effective upon separation or divorce.  Postnuptial agreements were allowed, however, where the parties had already separated or were on the point of separating (separation agreements).  2 H. Clark, Domestic Relations §19.1, at 411 (2d ed. 1987).  Clark notes that it was never clear why executing a postnuptial agreement while the parties were still living together was conducive to divorce, but the courts found that it was.  2 H. Clark, Domestic Relations §19.1, at 411 (2d ed. 1987).        More recent statutes make it clear that there is no longer any general public policy opposed to agreements contemplating divorce.  2 H. Clark, Domestic Relations §19.1, at 411 (2d ed. 1987).  In 1977, the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) made 
separation agreements dealing with property and maintenance valid.  750 ILCS 5/502 (West 1998).  "This section entirely reverses the older view that property settlement agreements are against public policy because they tend to promote divorce."  Uniform Marriage and Divorce Act §306, 9A U.L.A., Comment, at 249 (1998).  Separation agreements, however, which are agreements "attendant upon the dissolution of [the] marriage," are postnuptial agreements, not premarital agreements.   Since 1977, section 503 of the Dissolution Act has allowed premarital agreements that deal with questions of marital property.  750 ILCS 5/503(d)(7) (West 1998) (court shall consider "any antenuptial agreement of the parties"); 
In re Marriage of Jelinek
, 244 Ill. App. 3d 496, 501-02, 613 N.E.2d 1284, 1289 (1993).  There was a question, however, whether the Dissolution Act changed the previous rule that a premarital agreement could not deal with questions of maintenance.  750 ILCS 5/504(a)(11) (West 1998) (factors to consider when awarding maintenance include "any valid agreement of the parties"); see 
Eule v. Eule
, 24 Ill. App. 3d 83, 87, 320 N.E.2d 506, 510 (1974) (holding invalid a premarital agreement waiving temporary alimony if marriage did not last seven years); 
Warren v. Warren
, 169 Ill. App. 3d 226, 231, 523 N.E.2d 680, 684 (1988) (declining to enforce provision in agreement waiving right to maintenance upon divorce even though wife entered agreement with "full knowledge");
 
cf
. 
In re Marriage of Burgess
, 138 Ill. App. 3d 13, 15, 485 N.E.2d 504, 505 (1985) (premarital agreements determining right to maintenance valid if "fair and reasonable").  The legislature, however, has now answered that question and affirmed the validity of premarital agreements.

Effective January 1, 1990, Illinois adopted the Uniform Premarital Agreement Act (Premarital Agreement Act) (750 ILCS 10/1 through 11 (West 1998)).  The Premarital Agreement Act confirms that prior to marriage, parties may contract with respect to the "disposition of property" and "modification or elimination of spousal support."  750 ILCS 10/4(a)(3), (a)(4) (West 1998).  Since the Agreement at issue here was executed in 1991, the Premarital Agreement Act applies to our review of the issues presented.

II. SUMMARY JUDGMENT

In answer to Sandra's divorce petition, Edward asserted the terms of the Agreement as controlling on the issues of property distribution and maintenance.  Sandra acknowledged that she signed the Agreement but claimed it was unenforceable because it was obtained by coercion and duress.  750 ILCS 10/7(a)(1) (West 1998) (premarital agreement is unenforceable if not voluntarily executed).

When asked at her deposition to define the nature of the alleged coercion, Sandra testified as follows:

"Q.  Again, why don't you tell me what the element of coercion is with regard to signing this agreement marked exhibit No. 1.

A.  There would be no wedding unless this thing was signed.

Q.  And this is the coercion that you were speaking of in your answer?

A.  Yes.

* * *

Q.  Would you explain again why you deny the request to admit that you were under no duress from any person or entity when you signed the agreement?  Tell me what duress you were under.

A.  The time line was the duress coming from Ed, either sign this or there won't be any wedding."

The Agreement was witnessed by Sandra's attorney, Randall Ehlers.  The Agreement establishes that Sandra had consulted with her attorney, who had reviewed and advised her as to her rights under the Agreement.  Further, the signature page of the Agreement included an acknowledgment that the parties fully reviewed the terms and provisions and that the execution was a voluntary act, devoid of coercion or duress.  Sandra also acknowledged that she had been fully informed of Edward's wealth, property, estate, and income.

In June 1999, Edward moved for summary judgment as to the validity of the Agreement.  The trial court found that the Agreement was valid and controlled issues of property distribution and maintenance.  Sandra argues that there are disputed issues of fact relating to her claims of coercion and duress that preclude summary judgment.

Mere legal conclusions unsupported by facts do not create an issue of material fact sufficient to defeat a motion for summary judgment.  See 
Lackey & Lackey, P.C. v. Prior
, 228 Ill. App. 3d 397, 399-400, 591 N.E.2d 998, 1000 (1992).  Neither Sandra's response to the motion for summary judgment before the trial court nor her brief on appeal points to any factual basis in support of her claims to invalidate the Agreement.  In response to Edward's motion, she attached transcripts from her own deposition and that of her attorney.  However, no single reference to testimony raises a factual issue.  Similarly, Sandra's brief on appeal offers no record citation to support her conclusory allegations that the Agreement was a result of coercion.

In her reply brief, Sandra states that the deposition testimony is "replete" with factual issues relating to her claim of coercion; however, she again failed to direct us to specific facts that would support her allegations.  Sandra has the burden of proving that the Agreement was unenforceable.  750 ILCS 10/7 (West 1998).  The only factual reference to coercion in her deposition testimony was her statement that the Agreement was a condition to marriage.  We disagree with Sandra's assertion that conditioning marriage upon the execution of a premarital agreement constitutes coercion.  Acts or threats cannot constitute duress unless they are legally or morally wrong.  
In re Marriage of Spomer
, 123 Ill. App. 3d 31, 35, 462 N.E.2d 724, 728 (1984).

Both Edward and Sandra could have remained single.   Nothing was legally or morally wrong with either of them conditioning marriage upon the execution of a premarital agreement.  Their right to enter into such an agreement was codified by the Premarital Agreement Act.  One party's agreement to marry is in and of itself sufficient consideration for financial concessions by the other party in the context of a premarital agreement.  
In re Marriage of Sokolowski
, 232 Ill. App. 3d 535, 542, 597 N.E.2d 675, 680 (1992).  

Sandra has admitted that she was totally self-sufficient and supporting herself at the time the Agreement was executed.  She was free to elect to remain single rather than sign the Agreement.  Her arguments on appeal offer only general statements of law without any reference to an actual disputed fact in the record.  Her brief points to nothing in either her own testimony or the deposition of her attorney that contravened her verified statement in the Agreement that the document was executed as a "free and voluntary act, devoid of coercion or duress."  The trial court was presented with an Agreement that Sandra Barnes not only admitted she signed, but in which she contemporaneously attested under oath was executed free of duress and coercion, an oath taken before her own attorney, acting as a notary.  Sandra has come forth with no evidence to create a genuine issue of material fact that would controvert the voluntary nature of the Agreement.

III. DESERTION AS BASIS OF DISSOLUTION

Sandra initiated this divorce proceeding in January 1999.  After the trial court's entry of summary judgment in September 1999, declaring the Agreement valid, Sandra filed a second count to her divorce petition, seeking maintenance.  In January 2000, Edward filed a counterpetition for divorce on the grounds of desertion.  Sandra then moved to voluntarily dismiss her divorce petition.  After her petition was dismissed, the case proceeded on the grounds raised by Edward.

The Dissolution Act provides for dissolution upon proof that "the respondent has wilfully *** absented *** herself from the petitioner for a space of one year, including any period during which litigation may have pended between the spouses for dissolution of marriage or legal separation."  750 ILCS 5/401(a)(1) (West 1998).  Edward had the burden to prove the elements of desertion by a preponderance of the evidence.  
Edmond v. Edmond
, 20 Ill. App. 3d 40, 44, 312 N.E.2d 766, 770 (1974).  Only Sandra and Edward testified at the dissolution hearing.  Edward testified that Sandra left the home on December 28 or 29, 1998.  The record reflects that Sandra filed this divorce action 15 days after leaving the marital residence.  She never returned to the marital residence at any time thereafter up to the date of the hearing on the grounds for dissolution, January 26, 2000.  

Sandra argues that Edward failed to establish desertion because she offered to return to the marital home after learning that he was seriously ill.  Sandra testified that Edward laughed at her offer to return home and hung up the phone.  Edward denied that Sandra offered to return to the marital residence.

After hearing testimony, the trial court simply resolved the factual issues relating to the elements of desertion in favor of Edward.  It is the province of the trial judge to determine the credibility of witnesses.  The trial court's finding will not be disturbed unless manifestly against the weight of the evidence.  
In re Marriage of Marx
, 281 Ill. App. 3d 897, 901, 667 N.E.2d 734, 736 (1996).  The trial court had sufficient evidence to support its finding of desertion, and the judgment of dissolution on that ground was not against the manifest weight of the evidence.

IV. MARITAL PROPERTY

Sandra next argues that the trial court erred in refusing to award her a one-half interest in various items she claims were marital property.  The Agreement set forth a specific method for characterizing marital property upon dissolution of marriage:

"Marital property shall be defined as all property and assets acquired subsequent to the marriage by the jointly owned funds of the parties, except as otherwise herein provided in this Agreement, and expressly excluded therefrom any income, accretions (inclusive of accretions attributable to the personal efforts and labors of either party), conversions, substitutions, and/or replacement of non[]marital property, and property acquired with the funds owned solely by one party or the other."

The Agreement also addressed the issue of marital property regarding commingled funds, providing: 

"It is further expressly agreed that in the event either party shall make a contribution of property or income from his or her non[]marital estate to the non[]marital estate of the other or shall make a contribution of property or income from his or her non[]marital estate to the marital estate, then in that event, the contributi[ng] estate shall be entitled to reimbursement in an amount equal to said contribution.  Unless otherwise agreed in writing, said contribution shall not be deemed a gift to the recipient estate."

Under the terms of the Agreement, the marital property was to be divided equally.  At trial, Sandra claimed that property in addition to that she sought in her answers to interrogatories should be designated as marital property for purposes of the dissolution.  The additional property included the following:

(1)  a Duke twin-engine airplane;

(2)  Edward's retirement account;

(3)  $1 million life insurance proceeds on the life of a former Glass Specialty Company, Inc., shareholder;

(4)  a Lincoln Navigator automobile;

(5)  joint savings accounts; and

(6)  30% of the stock in Glass Specialty Systems Company acquired by Glass Specialty Company, Inc., in 1997.

At trial, it was undisputed that the Duke aircraft, the life insurance proceeds, the Lincoln Navigator, and the stock holding representing 30% of Glass Specialty Systems Company were property of the corporate entity Glass Specialty Company, Inc., and not the property of Edward Barnes. 

With respect to Sandra's claim to some or all of Edward's retirement savings, she admitted that the retirement accounts were the same as those referenced in the Agreement.  By the terms of the Agreement, Edward's retirement accounts, "including contributions or accretions subsequent to the marriage[,] are deemed nonmarital property." 

Sandra's main claim for marital property is to funds held in joint accounts.  She claims that a cash deposit of loan proceeds secured by Edward individually relative to his nonmarital business that was held in the parties' joint account was marital property.  There was no dispute that these funds were loan proceeds borrowed solely by Edward, secured by his nonmarital property, and for which he was solely liable.  Sandra urges that these loan proceeds were converted from Edward's nonmarital property to marital property by their deposit into a joint account.  

No such conversion of nonmarital proceeds to marital property can occur based upon the express language of the Agreement.  By its own terms, the Agreement defines any contribution to the marital estate from a party's nonmarital estate as a loan subject to reimbursement to the nonmarital estate from which it came.  If the funds gave rise to anything relative to the marital estate, it was a loan from Edward's nonmarital estate to the marital estate that had to be repaid.  By the express terms of the Agreement, the loan must be presumed absent a writing to the contrary.  No such writing exists.

The trial court's finding that the sole marital assets of this marriage, as that term was defined by the Agreement, were the personal items Sandra identified and valued in her original answers to interrogatories and set forth in her exhibit provided to the court was supported by the record.  

V. MAINTENANCE 

The Premarital Agreement Act permits parties to contract with respect to the "modification or elimination of spousal support."  750 ILCS 10/4(a)(4) (West 1998).  The Agreement addressed the issue of maintenance as follows: 

"Each party hereby acknowledges, warrants, and represents that he/she is possessed of sufficient assets, property, income, educational and vocational skills, training, and experience, all of which permit and enable them to fully support and maintain themselves without financial assistance from the other.  Accordingly, upon the entry of a judgment for dissolution of marriage between the parties by a court of competent jurisdiction, each hereby waives and shall be forever barred from asserting a claim for maintenance against the other; past, present, or future, except that in consideration of the foregoing and in lieu of maintenance, alimony[,] or support, if the dissolution occurs more than three (3) years after the marriage, ED shall pay SANDRA $5,000; if the dissolution occurs more than five (5) years after the marriage, ED shall pay SANDRA $7,500; if the dissolution occurs more than seven (7) years after the marriage, ED shall pay SANDRA $10,000; if the dissolution occurs more than fifteen (15) years after the marriage, ED shall pay $25,000 to SANDRA.  The term 'occurs' means that a decree of dissolution is entered by a court of competent jurisdiction, whether all issues are determined or not between the parties." 

Despite this provision, Sandra asked the trial court to award maintenance.  She relies upon an additional section in the Premarital Agreement Act that states:

"If a provision of a premarital agree-

ment modifies or eliminates spousal support

and that modification or elimination causes

one party to the agreement undue hardship in

light of circumstances not reasonably fore-

seeable at the time of the execution of the

agreement, a court, notwithstanding the terms

of the agreement, may require the other party

to provide support to the extent necessary to

avoid such hardship."  750 ILCS 10/7(b)

(West 1998).

This section does not automatically obviate the parties' rights to contract for the elimination of spousal support.  The application of section 7(b) applies only where such relief is necessary to avoid undue hardship in light of circumstances not reasonably foreseen at the time of the execution of the agreement.  750 ILCS 10/7(b) (West 1998).  The statute merely states that the court "may" grant additional support.  By use of the word "may," the legislature made such an award a matter of discretion for the trial court.  

The issue of whether undue hardship existed as a result of circumstances not reasonably foreseeable at the time of the agreement was for the trial court to decide upon the evidence presented.  We will not overturn the trial court's judgment unless it is contrary to the manifest weight of the evidence.  
Marx
, 281 Ill. App. 3d at 901, 667 N.E.2d at 736.

The Agreement reflected the gross disparity in the parties' assets and income at the time of the marriage.  Sandra acknowledged that she was aware at the time of the Agreement that Edward's income far exceeded her own.  She lived a lifestyle with Edward that was beyond what she could possibly have enjoyed on her own before or after a dissolution of the contemplated marriage.  She nevertheless entered into the Agreement whereby, upon a dissolution, she waived all maintenance other than a stipulated amount tied to the length of the marriage.  Pursuant to the Agreement, Edward was ordered to pay Sandra $10,000 in maintenance.  

At the time of trial, Sandra had already gained clerical employment at a salary of $24,000 a year.  She does not dispute that she can and is performing her employment duties within the acknowledged range of expertise referenced in the Agreement.  Adjusting from a lifestyle of luxury to one limited by a $24,000 salary may not be easy for Sandra, but we do not find such a transition to be an undue hardship.

With respect to the "unforeseen circumstances" issue, most of Sandra's argument refers to Edward's character flaws that made continuing the marriage impossible.  However, the record reflects that this was Edward's fifth marriage.  The fact that this marriage might fail was reasonably foreseeable.  The trial court was justified in finding that no undue hardship resulted and that the various "unforeseen circumstances" Sandra complained of were foreseeable.

VI. ATTORNEY-CLIENT PRIVILEGE

Sandra also argues that the trial court erred by requiring disclosure of privileged information.  During discovery in this case, Edward subpoenaed Sandra and her attorney, Ehlers, for deposition.  At those depositions, Edward's counsel asked about Sandra's mental state as related to her challenge to the validity of the Agreement.  Sandra's counsel objected to the questions relating to conversations between Sandra and Ehlers based upon the attorney-client privilege.  Sandra's counsel directed both witnesses not to answer these questions.  

Edward sought a ruling from the trial court regarding the objections and filed a written response and memorandum challenging the privilege raised.  The trial court ultimately denied Sandra's objections, finding that the information sought by Edward was not subject to the attorney-client privilege and ordered the witnesses to answer the tendered question relative to conversations between Sandra and Ehlers. 

The parties have raised numerous arguments regarding the extent of the attorney-client privilege and the burdens of establishing that privilege.  We need not address each of these arguments since we find that even if the trial court's order was in error, that error was harmless.  
Pickering v. Owens-Corning Fiberglas Corp.
, 265 Ill. App. 3d 806, 829, 638 N.E.2d 1127, 1143 (1994) (appellate court declined to address attorney-client privilege issue as that issue was moot and did not impact results in trial court).  As in 
Pickering
, we find that this issue is moot.  Upon the resumption of Sandra's and Ehlers' depositions, neither of them could recall any of the specifics of the conversations they claimed to be privileged.  All of the questions tendered were answered with the witnesses professing a lack of recollection.  No allegedly privileged information was revealed.  Despite the trial court's order, no communications were actually disclosed, and, therefore, any error as to the underlying ruling was harmless.

VII. ATTORNEY FEES

Sandra challenges the trial court's decision to award attorney fees at a rate of $125 per hour despite counsel's request to be paid at his customary and usual rate of $185 per hour.  Sandra argues that it was an abuse of discretion for the trial court to reduce the hourly rate because Edward did not contest the rate at trial.  We disagree.  The court must take into consideration a number of factors when awarding attorney fees.  The court is not bound by the attorney's opinion as to what constitutes a reasonable fee.  
In re Marriage of Ransom
, 102 Ill. App. 3d 38, 41, 429 N.E.2d 594, 598 (1981).  The court's award of attorney fees will not be reversed absent abuse of discretion.  
In re Marriage of Powers
, 252 Ill. App. 3d 506, 508-09, 624 N.E.2d 390, 392-93 (1993).  The trial court found that, "in McLean County, a reasonable hourly rate for an attorney of Mr. Vieley's experience engaged in family law litigation is $125 per hour."  The trial court's determination was within its discretion.

VIII. ATTORNEY FEES ON APPEAL

Sandra also claims the trial court erred in refusing to award her any prospective attorney fees for her appeal in view of her dire financial situation when compared to her ex-husband's wealth and income.  Sandra has not directed us to any authority requiring the trial court to award fees for an appellate challenge to the validity of a divorce judgment.  

Throughout this case, Sandra has sought to circumvent the provisions of the Agreement.  We do not doubt that one of the purposes of entering the Agreement was to avoid the substantial expenses of litigation that would result if the parties were divorced.  Sandra validly exercised her right to appeal the trial court's order.  Exercising that right, however, does not automatically entitle her to shift the financial burden for the appeal to Edward.  The trial court's decision to deny fees on appeal was within its discretion. 

Affirmed.

STEIGMANN, P.J., and MYERSCOUGH, J., concur.