SECOND DIVISION

May 17, 2005

No. 1-04-0499

IN RE THE MARRIAGE OF: ) Appeal from the 

) Circuit Court of

LESLIE BERGER, ) Cook County. 

)

Petitioner-Appellant, ) 

) 

v. )

) Honorable

ROBERT BERGER, ) LaQuietta J. Hardy-

) Campbell,

Respondent-Appellee. ) Judge Presiding.

               

JUSTICE WOLFSON delivered the opinion of the court: 

We are called on to decide high stakes issues that are the fallout from a failed marriage.  

Petitioner Leslie Berger appeals the judgment of dissolution of her marriage to respondent Robert Berger, challenging several parts of the trial court's order.  Leslie contends the trial court erred when it: (1) found the parties' antenuptial agreement, specifically the maintenance waiver, was valid and  binding; (2) awarded the assets held in two joint bank accounts to Robert, finding they were his non-marital property; (3) failed to assign the proper values to the parties' estates by relying on the asset disclosure statements; (4) ordered Robert to withhold $100,000 from Leslie's settlement due to her dissipation; and (5) denied Leslie's petition for attorney fees.

We affirm in part and reverse and remand in part.

FACTS

Leslie and Robert were married on August 20, 1982.  A few weeks earlier, Robert talked to Leslie about signing an antenuptial agreement.  Leslie's attorney received a first draft of the proposed agreement on August 9, 1982.  Robert and Leslie eventually signed the fourth draft of the antenuptial agreement (the Agreement) the day before their wedding.  

Under the Agreement, neither party would have a right to "support, maintenance, or alimony" from the other in the event of a divorce.  If the marriage were dissolved, Leslie was entitled to half the value of the marital residence.  They also agreed any property each of them owned or acquired would not be marital property and would remain the property of the respective owner.  Paragraph 6(b) of the Agreement stated, "any assets or property to which either party may be entitled pursuant to a right of survivorship or by contract or agreement created or entered into subsequent to their marriage shall belong to the party entitled thereto and shall not be subject to this agreement." 

At the time, Robert's net worth was more than $10 million, and he earned $450,000 annually from various investments.  Leslie was 27 and had a graduate degree.  Her net worth was $149,000 and she earned $30,000 annually as an advertising account executive.  Leslie’s attorney reviewed the Agreement and advised her not to sign it.  She signed it anyway.  Before they married, neither party intended to have children.  Three years later, Robert and Leslie decided to have a child, and their daughter Erica was born October 1, 1986.  

For several years, Robert and Leslie kept their finances separate, each controlling his or her own account.  In October 1994, the parties opened two joint checking accounts at Citibank,  the ‘880 account and the ‘068 account.  The accounts remained in existence until June 1999.  Account ‘880 was titled in Robert’s name first and Leslie’s second, and Robert primarily wrote checks on that account.  Account ‘068 was titled in Leslie’s name first and Robert’s second, and Leslie primarily wrote checks on that account.  The '068 account is not an issue in this appeal.  

In February 1996, Robert changed the title of his American National Bank ‘451 account to add Leslie's name, with right of survivorship.  According to Robert, he created joint accounts with Leslie at Citibank because she was suffering from Crohn’s Disease, and she was concerned about her demise.  She also was concerned about Robert’s advancing age, and they agreed that should there be a problem, "immediate cash should be available, and in illness or in death, cash is most important."  Robert added Leslie to the American National Bank ‘451 account for the "same reasons."  He said, "She wasn't getting any better in spite of the operations, et cetera."

The '451 account:
 

The court found Robert made every deposit into the ‘451 account from February 1996 through July 1999.  The total amount of the deposits was $5,516,872.  Over the same time period, Robert wrote checks on the account to cover the payment of jointly filed tax obligations, a few investments in non-marital property that he controlled, and, on occasion, to provide money for the ‘880 account.  On June 2, 1999, Leslie signed a request to purchase a cashier’s check from the ‘451 account in the amount of $103,000.  She received the funds.  Between February 1996 and June 2, 1999, Leslie made no other withdrawals from the ‘451 account.  She wrote no checks on the account, nor did she have a checkbook or check register for the account.  Only Robert and his bookkeeper had access to the checkbook and check register for the account, and only Robert’s name was printed on the checks.  Between April 22, 1996, and June 22, 1999, Robert wrote 41 checks on the ‘451 account.  The court found seven of the checks were for Robert’s personal use or for his non-marital property use.  The seven checks totaled $322,490.56, or approximately 5.8% of the amount deposited into the account by Robert between 1996 and 1999.  On May 14, 1999, the ‘451 account had a $27,096.16 balance.  

The '880 Account:

Between October 1994 and June 2, 1999, Robert made all the deposits into the ‘880 account, totaling $5,698,912.  Of the 1,497 checks written on the ‘880 account during that period, Leslie wrote a total of five checks, all for Rancho Mirage household expenses.  The rest were written by Robert.  The bulk of the checks written on the account were for family and household expenses, and a few were written for Robert’s investment expenses.  On May 11, 1999, the day before she filed for dissolution of marriage, Leslie withdrew $60,000 from the ‘880 account.  On June 7, 1999, she withdrew $50,000 from the ‘880 account.  Other than the five checks she wrote, those two withdrawals were the only withdrawals she made on the ‘880 account.  Her name was on the '880 account checks.  Leslie never made any deposits into the account.  Robert had possession of the checkbook and check register for the account.  Leslie had a debit card linked to the ‘880 and ‘068 accounts, but never used it to withdraw money from the ‘880 account.  On May 12, 1999, the ‘880 account had a $61,248.50 balance.  

Leslie filed her petition for dissolution of marriage on May 12, 1999.  In her amended petition, she alleged the Agreement was procured by fraud and duress.  

Robert filed a motion for declaratory judgment on the validity of the Agreement. 

Leslie testified the parties' wedding date was changed from November to August 20, 1982, and the Agreement was signed one day earlier, at a time when Robert was being investigated by the federal government.  She said she signed the Agreement under duress because Robert told her he could not get married without the Agreement due to his business with his brothers, and he said his lawyers wanted him to get married before his indictment in order to avoid a long sentence.  He later pled guilty to a mail fraud charge.

Robert testified the wedding date was changed out of Leslie's concern for her elderly grandmother, who would have difficulty with colder November weather.  He denied that the wedding date was changed because of his potential indictment or the investigation.  Robert also testified he wanted the Agreement to protect his assets for his children.

The trial court entered its order on June 6, 2002, stating the Agreement was valid and binding on both parties.  The court said the Agreement was fair because Leslie signed the Agreement despite her attorney's advice against it.  At the time, she was 27 years old, had obtained a graduate degree, and was confident in her ability to support herself.  Leslie told her attorney Robert wanted the Agreement to protect the interests of his children from a former marriage and that she did not want anything to upset their upcoming marriage.  The court found the Agreement provided Leslie an equitable settlement--a minimum of $1.25 million from the marital residence, the $800,000 home she purchased in Glencoe while they were separated, and $600,000 in other assets she had acquired.

The court found Robert's version of the events leading up to their wedding more credible.  The court concluded that although Leslie may have been under stress due to Robert's criminal investigations, she signed the Agreement because she wanted to marry Robert and he would not get married without it.

After several days of testimony, another trial judge entered the judgment for dissolution of marriage.  In that judgment, the court decided the Agreement's maintenance waiver was valid and denied Leslie's request for maintenance.  The court traced the assets in the parties' various joint bank accounts and determined they were not marital property.  The '880 and '451 accounts were awarded to Robert.  The only marital property divided between the parties was their marital residence in Glencoe and the "Fallen Angel Stock Fund."  The marital home was valued at $2.8 million.  Although Leslie was entitled to $1.4 million as her share of the property, the court reduced the amount Robert was to pay her by $100,000 as a result of her dissipation of the assets she withdrew from the '880 and '451 accounts.  The court denied Leslie's petition for attorney fees. 

DECISION

I.  The Validity of the Antenuptial Agreement

Leslie contends the trial court erred when it found the Agreement was valid and binding.  She asks this court to find the entire Agreement invalid, or, at a minimum, reverse the portion of the trial court's order upholding the validity of the Agreement's maintenance waiver.  The parties' Agreement predates Illinois' Uniform Premarital Agreement Act (750 ILCS 10/1 
et
 
seq
. (West 2002)), so we must rely on common law when deciding the Agreement's validity.

Under Illinois decisional law, antenuptial agreements determining rights to property and maintenance are valid and enforceable as long as three conditions are met:  (1) the agreement does not create an unforeseen condition of penury due to one spouse's lack of property or employability; (2) the parties entered into the agreement with full knowledge, free of fraud, duress, or coercion; and (3) the agreement is fair and reasonable.  
Warren v. Warren
, 169 Ill. App. 3d 226, 230, 523 N.E.2d 680 (1988).  Although maintenance waivers are disfavored in Illinois, a waiver will be enforced if it was given in exchange for significant financial consideration.  
In re Marriage of Martin
, 223 Ill. App. 3d 855, 857, 585 N.E.2d 1158 (1992).

Leslie does not contend she will suffer a condition of penury as a result of the Agreement.  Nor does she dispute the trial court's finding that she was not subject to any fraud, duress, or coercion at the time she signed the agreement.  Instead, she contends the agreement should not be enforced because it is not fair and reasonable. 

In 
Warren
, 169 Ill. App. 3d 226, and 
Kolflat v. Kolflat
, 636 So. 2d 87 (1994), the courts struck down maintenance waivers in antenuptial agreements after finding them unfair or unreasonable.  In 
Warren
, the court found the wife signed the antenuptial agreement willingly, without fraud, duress, or coercion, and had full knowledge of her future husband's assets at the time.  Although her assets were modest, they were sufficient to keep her from suffering the condition of penury.  Nonetheless, the reviewing court found the maintenance waiver unfair due to the wife's financial circumstances.  
Warren
, 169 Ill. App. 3d at 231.  She had not worked since before the couple was married and had approximately $33,000 in assets, including a $30,000 house.  In comparison, her husband was worth $1.5 to $2 million, with $700,000 in debts.  The court based its finding of unfairness on two circumstances: (1) the agreement's complete lack of a financial settlement for the wife; and (2) the lavish lifestyle the couple enjoyed together for many years, which the wife had no hope of continuing on her own.  
Warren
, 169 Ill. App. 3d at 231.  

The court in 
Warren
 distinguished that case from 
In re Marriage of Burgess
, 138 Ill. App. 3d 13, 485 N.E.2d 504 (1985), where the court upheld a maintenance waiver, based on the different financial circumstances of the aggrieved parties.  In 
Burgess
, the woman seeking maintenance had a net worth of $412,000 before her marriage and earned $38,000 annually at the time of the dissolution.  
Burgess
, 138 Ill. App. 3d at 15.

In 
Kolflat
, the District Court Of Appeals of Florida applied Illinois law to determine the validity of an antenuptial agreement.  As in 
Warren
, the agreement met the first two conditions.  After reviewing the parties' financial circumstances and income potential, the court decided the maintenance waiver was unfair.  The husband had a net worth of over $4.7 million, while the wife had $109,000 in assets.  The wife was over 50 at the time of the divorce and lacked a college education or any specific work skills.  Because the agreement provided absolutely no financial support for the wife, and both enjoyed an extravagant lifestyle during the marriage, the court found the maintenance waiver was not enforceable.  
Kolflat
, 636 So. 2d at 90.

We find important differences between the facts in this case and the facts in 
Warren
 and 
Kolflat
.  Here, the Agreement did not leave Leslie without a financial settlement.  Under the Agreement, she was entitled to one-half the value of the marital residence.  If the parties had divorced early in their marriage, Leslie would have received approximately $150,000--her share of the $300,000 condominium they shared.  The residence at the time of dissolution was a $2.8 million house in Glencoe.  As a result, Leslie was awarded $1.4 million.  In addition, she kept her non-marital assets, valued at approximately $322,000 on her asset disclosure statement, and the $800,000 home she purchased while separated from Robert.  

Unlike the women in 
Warren
 and 
Kolflat
, Leslie has a graduate degree in advertising and is self-employed.  At the time of the parties’ marriage, Leslie was employed by Leo Burnett as an account supervisor on the RCA account.  Subsequently, Leslie worked for J. Walter Thompson as an account supervisor responsible for the Kraft Foods account.  Although Leslie stopped working for several years to raise Erica, she now owns her own business, Idea Resources.  The business's tax returns showed total incomes ranging from $118,447 in 1997 to $232,646 in 2000.  Leslie's personal tax returns showed Leslie had an adjusted gross income of $147,366 in 1998, $87,534 in 1999, $158,769 in 2000, and $92,175 in 2002.  Although her asset disclosure statement stated her monthly income was $5,883, she listed her monthly income as $28,000 on her mortgage application, which was filed two weeks before she filed her petition for dissolution.

Although Robert's personal wealth is much greater than Leslie's, we find the maintenance waiver is fair and reasonable in the circumstances of this case.  

II. Classification of Bank Accounts as Non-Marital Property 

The question we must decide is whether Robert intended to make a gift to the marriage when he created the joint bank accounts with right of survivorship.

Leslie contends paragraph 6(b) of the Agreement is the beginning and end of the inquiry.  That is, she says the paragraph should be read to mean any asset placed in joint tenancy after the marriage necessarily becomes marital property, with no further analysis required.  We do not agree with Leslie's strict reading of the paragraph.  At the same time, considerable attention must be paid to the paragraph in light of Robert's decisions to establish a right of survivorship in the accounts in 1994 and 1996, twelve and fourteen years after the marriage.  That paragraph, after all, was drafted by Robert's lawyer and virtually made a condition precedent for the marriage ceremony.  It represents an exception to the parties' stated intent to keep their property separate. 

Until the joint tenancies were created, Robert was able to claim complete protection for his non-marital assets.  He knew how to do that.  As an astute and successful investor, he must have known he was abandoning the protection of the Agreement when he established accounts '880 and '451.  We have been searching for an answer to the question of why he would take the risk of bringing the accounts outside the protective cover of the Agreement if he did not intend making a gift to the marriage.  We have been unable to find a reasonable answer.

In this lengthy record the only explanation Robert gave for creation of the joint accounts is:

"Well, she was suffering from her Crohn's.  It's a disease that apparently was diagnosed in '93, but she had it since she was a teenager.  She was afraid.  She hurt.  She was concerned about her demise.  It is a serious illness, and it is on the internet, a whole full description.  She was concerned about my advancing age, and we agreed that should there be a problem, that immediate cash should be available.  And in illness or in death unless anybody doesn't recognize it, cash is most important."

The failure to say something when the appropriate moment arrives for saying it is telling.  He said nothing about protecting his ability to make investments with his non-marital funds.  He never said the accounts were set up for his convenience or for any business purpose.  In fact, he never said he did not intend to make a gift to the marriage or give Leslie an interest in the funds.

This was not the deposit of a single asset, as occurred in 
In re Marriage of Guerra
, 153 Ill. App. 3d 550, 505 N.E.2d 748 (1987), where the husband said he arranged the joint accounts from the proceeds of his non-marital asset in order to make further investments.  Nor is it 
In re Marriage of Rink
, 136 Ill. App. 3d 252, 483 N.E.2d 316 (1985), where the husband was blind and testified he set up a joint account for the sake of his convenience, with no intent to give his wife an ownership interest.

In 
In re Marriage of Wojcicki
, 109 Ill. App. 3d 569, 440 N.E.2d 1028 (1982), relied on by Robert, the husband testified he placed non-marital properties into joint tenancy in an attempt to insulate himself and his wife from title transfer difficulties in the event one of them died.  His testimony persuaded the trial court and then the appellate court that the presumption of a gift was overcome.

None of the husbands in 
Guerra
, 
Rink
, 
Wojcicki
, or any other Illinois case we have been able to find intentionally triggered an escape hatch from an antenuptial agreement when establishing joint interests.

Here, we have a series of deposits and withdrawals, extending over a period of five years.  Although Leslie did not use her debit card for account '880, she had the power to do so.  When she wanted to withdraw funds from either account in 1999, she did so, in large amounts.  Robert had not set up any mechanism to stop her, even when the marriage started to unravel.

We note Robert was substantially impeached when he filed with the court a statement putting his net worth at $23,347,000, while in 2001 his financial statement at the bank put his net worth at $46,446,308.  We also believe a statement reflecting the "historical cost" of assets, rather than their fair market value, is a disingenuous approach to financial fact submission to a court.

The actual amount of Robert's net worth matters, because the size of the husband's net worth in relation to the joint asset was an important factor in 
Guerra
, where the percentage was 44 percent.  Here, if we take Robert's statement to the bank as true, the percentage of total deposits is about 25 percent--still a large amount, but leaving about $35 million outside of the joint accounts.

We are aware that we must apply a manifest weight of the evidence standard to the trial court's findings on the existence of marital and non-marital property.  
In re Marriage of Gurda
, 304 Ill. App. 3d 1019, 1023-24, 711 N.E. 2d 339 (1999).  A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, and not based on the evidence.  
Maple v. Gustafson
, 151 Ill. 2d 445, 454, 603 N.E. 2d 508 (1992).

Even though property might be considered non-marital under section 503(a) (750 ILCS 5/503(a) (West 2002)), courts will presume a spouse who placed non-marital property in joint tenancy with the other spouse intended to make a gift to the marital estate.  
In re Marriage of Cecil
, 202 Ill. App. 3d 783, 788, 560 N.E.2d 374 (1990).

Robert had the burden of rebutting the presumption of gift with evidence that not only is "clear and convincing," but also "unmistakable."  
In re Marriage of Orlando
, 218 Ill. App. 3d 312, 317, 577 N.E. 1334 (1991) (a trial judge's non-marital property determination was against the manifest weight of the evidence).

We have said: "Any doubts as to the nature of the property are resolved in favor of finding that the property is marital."  
In re Marriage of Hegge
, 285 Ill. App. 3d 138, 141, 674 N.E.2d 124 (1996).  Further, there is a "legislative preference, expressed in section 503, for the classification of property as marital."  
In re Marriage of Smith
, 86 Ill. 2d 518, 529, 427 N.E.2d 1239 (1981).

The mere fact that all funds deposited in a jointly held account came from the husband’s non-marital assets was not enough to rebut the presumption that he intended a gift to the marriage in 
In re Marriage of Emken
, 86 Ill. 2d 164, 427 N.E.2d 125 (1981).  There, the supreme court observed that the husband knew how to retain sole ownership of a time deposit certificate when he wanted to.  The court said: 

"The deposit of certain funds in the joint account out of which household expenses of the parties are paid while retaining sole ownership of other funds tends to prove that it was respondent's intent that the jointly held funds be marital property."  
Emken
, 86 Ill. 2d at 166.

Here, Robert maintained the American National Bank Safekeeping Investment Account 703466 and several other accounts in his name only, effectively invoking the protection of the Agreement.  The bulk of the funds from the '880 account were used by Robert for household and family expenses.

While the trial court relied almost entirely on the 
Guerra
 decision, it ignored another Second District decision that distinguished 
Guerra
.  In 
In re Marriage of Gattone
, 317 Ill. App. 3d 346, 739 N.E.2d 998 (2000), all of the funds used to purchase a house in joint tenancy came from the husband's non-marital assets.  The court noted that the size of the purported gift in relation to the husband's entire estate was only a single factor that does not, standing alone, determine whether property is marital or non-marital.  
Gattone
, 313 Ill. App. 3d at 353.  There, as here, the husband used an unacceptable method of calculating his estate.  Finding the presumption of a gift was not rebutted, the court found no facts in the record that demonstrated the husband's intent to keep his non-marital assets separate from marital assets.  That is, "There are steps [the husband] could have taken to make sure his non-marital assets retained their distinct identity, if that was his desire."  
Gattone
, 313 Ill. App. 3d at 354.  Robert's steps were in the opposite direction.

True, the 
Gattone
 case involved a marital home.  But our supreme court has said, "We fail to perceive a distinction between a jointly held marital residence and a jointly held account."  
Emken
, 86 Ill. 2d at 166.

Given the particular circumstances of this case,
 viewed from the aperture of paragraph 6(b) of the Agreement
, we conclude the trial court erred when it held the deposits made in the '451 and '880 accounts were Robert's non-marital property.  The trial court did not give due weight to the presumption of marital gift that arose when Robert arranged for Leslie to have a right of survivorship in 1994 and 1996.  It should not be easy to overcome that presumption.  If it were, an unnecessary failure of certainty and predictability would enter the financial relationships of spouses and would create wasteful and cumbersome litigation, as happened here.  

We conclude Robert did not overcome the presumption that the deposits were gifts to the marriage.  We reverse the trial court's findings and remand this cause for the purpose of determining how the marital funds deposited in the two accounts are to be apportioned between Robert and Leslie.  When doing so, the trial court should reassess its uncritical acceptance of Robert's net worth statement and should apply a fair market value standard to the assets of both parties.

III. Dissipation of Assets

In a dissolution of marriage proceeding, the Act requires a court to divide marital property in just proportions, considering all relevant factors, including "the dissipation by each party of the marital or non-marital property."  750 ILCS 5/503(d)(2) (West 2002).  The court found Leslie dissipated Robert’s non-marital estate in the amount of $213,000--the total amount of her three withdrawals from the ‘880 and ‘451 accounts in May and June 1999.  The court found Leslie made the withdrawals at a time when the marriage between the parties was undergoing an irreconcilable breakdown, and she used the withdrawals for purposes unrelated to the marriage.  The court held:

"After considering all appropriate factors under Section 503, the Court will allow Robert to credit the payment he is to make to Leslie under the Antenuptial Agreement in the amount of $100,000 as a result of her dissipation.  Thus, the total payment due to Leslie from Robert, which shall be paid in 35 days from the date of the Findings, is $1,300,000." 

A party charged with dissipating marital assets must establish by clear and convincing evidence how those funds were spent.  General and vague statements that the funds were spent on marital expenses or to pay bills are not enough to avoid a finding of dissipation.  
Hagshenas
, 234 Ill. App. 3d at 194.  The issue of dissipation is a question of fact, and the trial court’s finding will not be disturbed unless it is against the manifest weight of the evidence and thus an abuse of discretion.  
In re Marriage of Tietz
, 238 Ill. App. 3d 965, 984, 605 N.E.2d 670 (1992); 
In re Marriage of Seversen
, 228 Ill. App. 3d 820, 824, 593 N.E.2d 747 (1992).       

At trial, Leslie testified she used the money to pay living expenses, take her daughter on a trip to Europe, and purchase some items for her new home.  Her statement that the money was used for living expenses was too general and vague to prove the funds were spent on marital expenses.  We affirm the trial court’s finding that Leslie dissipated the funds when she made the withdrawals from the joint accounts.     

IV. Attorney Fees

Leslie contends the trial court erred when it denied her petition for attorney fees.  Leslie's petition sought $340,795 in fees.  She contends "requiring her to pay all of her own attorney[] fees and costs would significantly reduce her relatively meager estate."

Under Illinois law, each party pays his or her own attorney fees unless the party seeking fees is unable to pay and the other spouse has the ability to do so.  
In re Marriage of Schneider
, 214 Ill. 2d 152, 824 N.E.2d 177 (2005); see 750 ILCS 5/508 (West 2002).  We will not reverse the trial court's decision to deny fees unless we find the court abused its discretion.  
Schneider
, 214 Ill. 2d at 174.

We find no abuse of discretion.  We agree with the trial court's decision because Leslie failed to show she was unable to pay her own fees.  See 
Schneider
, 214 Ill. 2d at 174-75 (no abuse of discretion where party seeking fees failed to show inability to pay).  Furthermore, we do not agree with Leslie's contention that requiring her to pay her own fees will deplete her estate, especially in light of our disposition of the joint bank accounts issue.  After paying the remaining $340,795 in fees, Leslie will still have more than $1 million in assets in addition to her portion of the joint accounts.  Moreover, Robert paid $197,470.07 to Leslie’s attorneys and $13,000 to her opinion witness in interim fees and costs.  We affirm the trial court's decision to deny Leslie's petition for attorney fees.

CONCLUSION

We affirm the trial court’s findings related to the Agreement, the maintenance waiver, dissipation, and attorney fees.  We reverse the finding that the ‘451 and ‘880 accounts were Robert’s non-marital property and remand for further proceedings consistent with this opinion. 

Affirmed in part and reversed in part; cause remanded.  

BURKE, P.J., and GARCIA, J., concur.