2020 IL App (1st) 180979-U

FOURTH DIVISION
August 13, 2020

Nos. 1-18-0979 & 1-18-2493
Consolidated

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF LEONARD KRANZLER, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Petitioner-Appellee, | ) ) | Cook County. |
| | ) ) | No. 16 D 10698 |
| v. | ) ) | |
| ULIANA KRANZLER, | ) ) | |
| | ) | John Thomas Carr, |
| Respondent-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    Held: The circuit court did not err in refusing to grant respondent's petition for contribution or a further hearing on the petition, refusing to award respondent further maintenance, or in its classification of non-marital assets.

¶ 2    Following a bench trial, petitioner Uliana Kranzler appeals the circuit court's April 30, 2018, order regarding the division of property in the parties' divorce, and also the trial court's

November 21, 2018, order granting respondent Leonard Kranzler's postjudgment motion.[1] On appeal, Uliana argues that the trial court erred in (1) refusing to grant her a hearing on her petition for contribution to attorney fees, (2) refusing to award her maintenance, and (3) classifying assets Leonard acquired during marriage as his non-marital property. For the following reasons, we affirm.

¶ 3                                         I. BACKGROUND

¶ 4                        A. Procedural History Leading Up to First Appeal

¶ 5        On October 9, 1984, Uliana and Leonard executed a premarital agreement and married in a ceremony held in their home directly after.[2] At the time, Leonard was 47 years old and Uliana was 29 years old and approximately five months pregnant with the couple's first child. The parties ultimately had three children, all of whom were emancipated adults at the time Uliana filed a petition for dissolution of marriage in October 2015 (Case No. 15 D 9295).

¶ 6        Leonard filed a motion for a declaratory judgment in her dissolution case, asking the trial court to find the premarital agreement valid and enforceable. Uliana later voluntarily dismissed her petition for dissolution. Leonard initiated a separate dissolution action, which proceeded before the same judge (Case No. 16 D 10698).

¶ 7        The trial court held a two-day hearing on Leonard's motion for declaratory relief in Case No. 15 D 9295, at which both Leonard and Uliana testified. On May 1, 2017, the trial court entered an order in which it determined that the premarital agreement was valid and enforceable and granted Leonard's motion for declaratory relief. Uliana appealed to this court. We affirmed the trial court, finding that (1) the trial court had subject-matter jurisdiction over the dispute, and

---

[1] Uliana filed two separate notices of appeal and the cases were consolidated on appeal. However, we note that Uliana raises no specific challenges to the November 21, 2018, order.

[2] In the premarital agreement, Uliana was to receive payments of $2,500 for 100 months in lieu of maintenance or other property rights if either party filed for divorce. Any amounts awarded for contribution to her attorney fees or temporary maintenance was to be credit against this amount.

(2) that the parties' premarital agreement was valid and enforceable. *In re Marriage of Kranzler*, 2018 IL App (1st) 171169.

¶ 8                          B. Leonard's Petition for Dissolution

¶ 9        Meanwhile, proceedings on Leonard's petition for dissolution continued. Uliana filed a petition for temporary maintenance and also an amended petition for interim and prospective attorney fees on December 28, 2016.

¶ 10       On July 17, 2017, the trial court entered an order requiring, *inter alia*, (1) Leonard to pay interim attorney fees in the amount of $100,000 to Uliana's counsel, (2) Leonard to pay Uliana $7,500 per month starting on July 17, 2017, as "temporary payments," and (3) Leonard to maintain his will and estate plan in accordance with the terms of the premarital agreement. The order granted Uliana the right to remain in the marital residence, while Leonard paid for the residence's bills and Uliana's health insurance.

¶ 11       On July 6, 2017, Leonard filed a motion to bifurcate, asking the trial court to enter a bifurcated judgment which would dissolve the parties' marriage, but reserve determination of their financial and other property matters for later. On November 13, 2017, the trial court granted the motion and entered a "Bifurcated Judgment for Dissolution of Marriage" (Bifurcated Judgment), dissolving the parties' marriage. Uliana filed a motion to vacate the Bifurcated Judgment on December 7, 2017.

¶ 12                                    C. Bench Trial

¶ 13       The trial court conducted a bench trial regarding division of the parties' property over four days in January 2018. Leonard and Uliana both testified and presented numerous documentary exhibits. The trial court also considered the testimony from transcripts of the first trial involving the validity of the premarital agreement.

¶ 14                    1. Leonard's testimony

¶ 15        Leonard testified that he was currently residing with Uliana at 3150 North Lakeshore Drive in Chicago. Leonard testified that he was a physician of neurological surgery employed by Tenet Health Systems at the time of trial. Leonard testified that the prenuptial agreement he and Uliana executed when they married in 1984 was a mechanism to solve he and Uliana's uncertainties and he would not have married anyone without a prenuptial agreement. Leonard testified that attached as exhibit B to the premarital agreement the parties executed in 1984 was a list of his then-existing assets and liabilities, although several of the items listed no longer existed or he no longer owned. They had three children—Jenelle, Justin, and Jared.

¶ 16   a. Financial Assets

¶ 17        Regarding financial assets, Leonard testified that he has an International Money Market (IOM) seat that he acquired before he was married and he receives dividends of approximately $19,000 every three months from it. Leonard testified he believes the IOM seat was transferred into 30,049 shares of Chicago Mercantile Exchange (CME) group stock in 2004. Leonard testified that Form 1099-Div from 2014, which was admitted into evidence, showed he owned 30,049 shares of CME stock. Leonard testified that the dividends went into his Chase bank account and were used for family expenses. Leonard testified that the IOM seat was transferred into the shares but he "didn't pay much attention to the fact that it was shares, not a seat. So I don't view them as shares, but I see now they are shares. And they take the place of the IOM seat I owned for 30 years." On cross-examination, he testified that a CME stock statement from October 2016 showed a share price of $105.44; which equated to a value of $3,168,366.56. However, Leonard believed based on his own research that the IOM seat was worth only $45,000.

¶ 18    Leonard further testified that Neuro-surgical Specialists, Ltd., was also listed as an asset on exhibit B to the premarital agreement, but it has been defunct as a medical practice since 2010, he does not receive any income from it, and it is not worth the amount that was shown on the list ($1,500,000). He testified that this entity now runs an annual conference or course for students and student funds are used to pay for the conference. Leonard has not contributed any money or taken any money out.

¶ 19    b. Retirement Accounts and Life Insurance Policies

¶ 20    Leonard testified that he has a retirement account worth $21,168.02 as of September 2017 from his time working for Mount Sinai Hospital. He has a John Hancock retirement account with a value of $34,070.33 as of June 2017 for the time he worked for American Center for Spinal and Cranial Surgery. Leonard also had a Pershing Advisory Solutions, LLC, Lodestar Rollover Individual Retirement Account (Pershing Lodestar IRA). Leonard testified that he initially had a profit sharing and pension plan from Neuro-Surgical Specialists, Ltd. (Neuro-Surgical plan) from when he worked there, and it was listed as an asset on exhibit B. However, it was rolled over into his Pershing Lodestar IRA in 2010. He testified that the Neuro-Surgical plan had $800,000 in it before he was married; additional contributions and appreciation occurred over the years, and as of November 2017 the Pershing Lodestar IRA had a value of approximately $2.4 million.

¶ 21    With respect to life insurance policies, Leonard testified that exhibit B of the premarital agreement listed four life insurance policies as assets, but Leonard owned only one policy currently: the AXA Redefining Standards (AXA policy) worth $184,626.82, and he identified the life insurance policy document admitted into evidence. He testified that he took out the AXA policy "years ago," Uliana is the beneficiary, and he continues paying the premiums.

¶ 22    c. Real Estate

¶ 23    Leonard testified that he purchased the following properties before his marriage and currently still owned: (1) 1212 North Lake Shore Drive, Units 10BN and 27 BN, Chicago; (2) 3010 Marcos Drive, Apartment 306, North Miami Beach, Florida (purchased in 1967 and transferred half ownership to his sister in 1980).

¶ 24    Leonard testified that he purchased the following properties during his marriage but held title solely in his name: (1) 2716 West Sherwin Avenue, Chicago (purchased in 1996); (2) 1410 State Street, Chicago (sold in 2017; Leonard received approximately $550,000 from the sale and paid $100,000 of this to Uliana's attorneys); (3) Units 35D and 36A, 3150 North Lake Shore Drive, Chicago (where he resided with Uliana at the time of trial); and (4) vacant land in Montana (purchased in 2014 with his daughter).

¶ 25    Leonard testified that he and Uliana both held joint title to the following properties which were purchased during their marriage: (1) 121 Golden Isles, Unit RGS, Hallendale, Florida (purchased in 2005); and (2) 20341 N.E. 30th Avenue, Apartment PH-14, Aventura, Florida.

¶ 26    Leonard presented evidence regarding purchase dates and title and deed information for the properties. Leonard testified that other than the properties he jointly owned with Uliana, she has never been on any legal title to any of his other properties, or had any beneficial interest in or power over any of his land trusts in which he held his properties. Leonard testified that Uliana has managed their properties and rentals for approximately five years.

¶ 27    d. Miscellaneous Property

¶ 28

¶ 29    Leonard testified that he currently still owned the following items that were listed on exhibit B of the premarital agreement: a Bernadel violin and Hill Bow; the books, video, and

audio recordings; 12 Chagall paintings; 12 Dali paintings; and 5 works of African art. Leonard owns a 2012 Buick Lacrosse which he believed to be worth $13,000. Leonard testified that he also loaned his nephew $150,000 to pay for law school.

¶ 30   e. Bank Accounts

¶ 31       Leonard testified that he has a Chase Bank Premier checking account with a balance of $301,000 as of November 30, 2017. The parties have a joint account with Bank of America, but it had a negative balance. Leonard has a separate Chase account where his salary is deposited. He has another Chase bank account which holds security deposits.

¶ 32   f. Income, Expenses, and Financial Status

¶ 33       Leonard testified that he is currently employed by MacNeal Physicians Group full-time and receives payment based on the amount of work he does. He also receives Social Security benefits in the amount of $2,101 per month. His joint tax return for 2016 showed that he earned $442,812 from his physician salary; IRA distributions in the amount of $264,500, income from social security, and $36,804 of income from other activities. His adjusted gross income was $881,596 for 2016. Leonard believed he has paid his attorneys $180,000 total related to the divorce proceedings.

¶ 34       In terms of expenses, Leonard pays $2,000 per month for his life insurance policy. Leonard was paying $9,000 monthly to Uliana which included the court-ordered temporary payments, Uliana's health insurance and medical bills, and other expenses. He pays Uliana's utility bills for her property in Michigan. Leonard also provides financial support to his children in the amount of $6,000 per month. Leonard testified that he has two mortgages with a balance of approximately $250,000 each, one for the property in Golden Isles, Florida, and the other for 3150 Lake Shore Drive in Chicago. The monthly mortgage payment for 3150 Lake Shore Drive

is $4,190; association fees are $3,485; he pays $145 per week for house cleaning; and $300 for groceries.

¶ 35    Leonard testified that his will currently provides that his estate shall be divided into 10 shares to be divided among 6 recipients; Uliana shall receive one share, or 10% of his estate, regardless of their marital status at time of Leonard's death. Leonard testified that it was his understanding that if he were to die that day, Uliana would receive the life insurance policy, 10% of his estate, and the court-ordered monthly payments for 100 months. Additionally, he left 20% of his estate to each of their three children, 20% to his sister, 10% to religious institutions.

¶ 36                                   2. Uliana's Testimony

¶ 37    a. Work History, Health Status, and Expenses

¶ 38    In her case-in-chief, Uliana testified that she was 61 years old and lives at 3150 North Lake Shore Drive, Apartment 36A, in Chicago. It is a 5,500 square foot apartment and she has lived there for 26 years. She still lives there with Leonard, but they have separate bedrooms. During their marriage, they enjoyed season tickets to the opera, traveled extensively, and went on cruises.

¶ 39    She testified that she immigrated to the United States of America when she was 16 years old. She obtained a college degree in communications and managed a fitness club after graduation. She then went into real estate, assisting with running a real estate company office, but she stopped working in 1985 a few months before she had her first child. During the marriage, she was primarily responsible for the care of their children and managing the household, as Leonard was rarely home. She testified that, as the primary caregiver, she managed Jenelle's many allergies, ADD diagnosis, and psychiatric treatment. Uliana transported her

second child, Justin, to his many activities. She testified that her youngest child, Jared, had learning difficulties and required special programs and tutoring, which she facilitated.

¶ 40 Uliana testified that, during their marriage, Leonard gave her an allowance of $1,400 every Monday for household expenses. She also has a credit card in her name for other expenses such as clothes, shoes, toiletries, and purchases at Costco; Leonard always paid the balance on the card.

¶ 41 With respect to her current state of health, Uliana testified that she takes blood pressure medications, a steroid nasal spray, thyroid medicine, Xanax for anxiety, Flexeril, and Ambien. She experiences ocular migraines. She uses prescription eye drops for dry eyes that cost $442 per month. She takes Prolia twice a year for osteoporosis, which costs $1,700 each time and is not covered by insurance. Her health insurance monthly premium is $1,275, and she has a $7,000 deductible for medical care and a $2,500 deductible for medication. She has a "questionable" lump in her right breast. She testified that she suffered from obesity following the birth of Jared in 1990 and became severely depressed and diabetic. She had bariatric surgery performed in Brazil in 2006. She lost weight following the surgery, but became anemic and developed osteoporosis. She returned to Brazil in 2009 for additional surgery on her abdomen and developed an infection. She wears a compression bodysuit to limit her pain. Uliana testified that she also has hip problems and needs a hip replacement. She fractured her ankle last year. She testified that she cannot look for a job currently because of her chronic pain. She testified that she has not worked outside the home in 33 years and is not knowledgeable about computers.

¶ 42 Regarding her current expenses, she estimated $2,400 monthly for groceries, household supplies, and toiletries. Uliana frequently purchases groceries for her children. She estimated her own groceries cost $1,500 per month.

¶ 43    She testified that she currently receives $7,500 per month from Leonard and he pays her monthly health insurance premium and medical bills. She testified that she was asking the court to order him to pay $10,000 per month instead.

¶ 44    b. Real Estate

¶ 45    Uliana testified that she inherited a log house in Michigan from her mother, but she did not know its worth. She spends $700 per month for repairs and maintenance.

¶ 46    She testified that she and Leonard jointly own two properties in Florida, but she does not want them. She testified that the property in Aventura, Florida was usually rented, but was currently empty due to hurricane damage and required extensive repairs. She estimated the property was worth $180,000 and they had no mortgage on it. She and Leonard purchased the Golden Isles property in 2005 as a second home. It has a mortgage of $250,000. She estimated it was valued at $400,000. She testified that the property needs to be remodeled and was damaged in a hurricane.

¶ 47    She testified that she has managed Leonard's rental real estate since 2008 and also takes care of their Chicago and Florida homes. She manages approximately eight properties in Chicago and Florida. Her management duties include leasing the properties, collecting rents, keeping financial records, paying bills and real estate taxes, being on-call for emergencies and arranging for maintenance, and coordinating remodeling projects. She travels to Florida approximately four times per year to oversee maintenance and repairs. She took over management because she found out that Leonard was losing money. She testified that she no longer wishes to manage his real estate.

¶ 48    c. Bank Accounts and Other Property

¶ 49     Uliana testified that she has a Bank of America account in solely her name, another checking account with $7,000, a savings account with a few thousand dollars, a business banking account in solely her name, a Chase account where funds from real estate rentals are deposited, and another account for security deposits. She purchased a Lexus RX350 SUV in 2015; she traded in her previous car, which Leonard had purchased for her. She paid off the remaining $11,000 balance from their joint bank account at Bank of America. She also used this account to pay for repairs, real estate taxes, and emergencies.

¶ 50                     D. Procedural History Following Bench Trial

¶ 51     Following trial, the parties submitted written closing arguments and proposed judgments. Uliana's prior law firm, Katz & Stefani, filed a petition for attorney fees related to their representation of Uliana in her petition for dissolution (which she had voluntarily dismissed).

¶ 52     Uliana filed a petition for contribution to attorney fees on February 14, 2018. Uliana asserted that as of February 2, 2018, she owed her current law firm, Grund & Leavitt, P.C., $474,997.43 in fees and $33,505.64 in costs. She requested contribution from Leonard pursuant to section 503(j) and 508(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/503(j), 508(a) (West 2016)). The trial court set a hearing date for April 30, 2018, on Katz & Stefani's petition and Uliana's petition.

¶ 53     On February 16, 2018, Leonard filed a motion to dismiss Uliana's petition for contribution, arguing that she failed to separate out fees for different matters—her initial divorce action, the motion for declaratory judgment, Uliana's first appeal, and Leonard's petition for dissolution. Leonard argued that Uliana was not entitled to any fees related to her dissolution petition because she voluntarily dismissed it and she was not entitled to fees for her appeal because it resulted in an adverse ruling. Leonard also argued her claimed amount in fees was

unreasonable and that the premarital agreement provided that any attorney fees paid by Leonard must be included in Uliana's lump sum settlement, not in addition to it.

¶ 54    On February 27, 2018, the trial court entered an order setting Leonard's motion to dismiss for hearing on March 28, 2018. Uliana filed a response in which she argued that her petition for contribution did not request any fees related to her prior appeal.

¶ 55    On March 9, 2018, the trial court announced its ruling orally regarding the trial issues and indicated it would file a written judgment to that effect. During that hearing, the trial court also orally ordered that each party would pay their own attorney fees.

¶ 56    At the March 28, 2018, hearing, Uliana's counsel objected that the trial court had already ruled on her petition for contribution on March 9 without conducting a proper hearing. The trial court responded that it had considered all the evidence and arguments and that "both parties will pay their own fees." The trial court entered an order that day reflecting that (1) Leonard withdrew his motion as moot; (2) finding that, having previously disposed of the attorney fee issue in its ruling on March 9, it denied Uliana's petition for contribution; (3) striking the April 30 hearing date; and (4) denying Uliana's motion to vacate the Bifurcated Judgment.

¶ 57                    E. Supplemental Judgment

¶ 58    On April 30, 2018, the trial court entered a written Supplemental Judgment. The court took judicial notice that it had previously found the premarital agreement was valid and enforceable. The remaining issues involved the classification of assets and liabilities under the premarital agreement, the award of payments to Uliana under the agreement, and the disposition of her attorney fees. The court observed that both parties were credible witnesses.

¶ 59    With regard to the classification of assets, the trial court held that the following properties were premarital assets owned by Leonard before the marriage and were classified as non-marital

property pursuant to the premarital agreement and its attachments: (1) 1212 North Lake Shore Drive, Unit 10 BN in Chicago, with an appraised value of $825,000; (2) 1212 North Lake Shore Drive, Unit 27 BN in Chicago, with an appraised value of $825,000; and (3) 2010 Marcos Drive, Unit 306, in Miami, with an appraised value of $70,000 and currently held in joint tenancy by Leonard and his sister. The following items were also owned by Leonard before marriage and remained his non-marital property under the agreement: violin, Hill Bow, furniture, library books and recordings, Chagall paintings, Dali paintings, and African art.

¶ 60    The trial court held that the IOM seat/CME group stock was also Leonard's separate non-marital property which he owned before marriage. The trial court noted that Uliana's counsel had attributed a high value to it, but under the terms of the premarital agreement, "this property was clearly Leonard's prior to his marriage." The trial court held that there was no evidence introduced challenging this asset as Leonard's property.

¶ 61    Pursuant to paragraph 4 of the premarital agreement, the trial court awarded all of Leonard's retirement accounts to Leonard as his non-marital property: the Pershing Lodestar IRA, the Sinai 403(b) and 401(a) Plan accounts, and the John Hancock 401(k) account. Under the same provision, the trial court awarded Leonard the $150,000 loan he made to his nephew for law school and the AXA life insurance policy.

¶ 62    Next, the trial court determined that under the premarital agreement, the following properties, which were acquired during the marriage, would otherwise be divisible property, but because they were held solely in Leonard's name, they were Leonard's non-marital property: (1) 2716 Sherwin Avenue in Chicago (appraised value of $500,000); (2) 1410 N State Parkway, Unit 12B in Chicago (sold on October 20, 2017—Leonard paid $100,000 of the proceeds to Uliana's attorneys and deposited the remaining funds in his bank account); (3) vacant land in Bozeman,

Montana held in joint tenancy by Leonard and his daughter (valued at $140,000); (4) Units 35D & 36A, 3150 North Lake Shore Drive in Chicago (appraised at $1,800,000 and encumbered with a mortgage balance of $2,411,260). The trial court also determined that the numerous bank accounts in only Leonard's name were also his non-marital property.

¶ 63  The trial court found that Leonard and Uliana acquired the following properties as joint tenants during their marriage, and they were thus marital property under the premarital agreement: (1) 121 Golden Isles, Unit RGS in Hallendale, Florida (purchased in 2005 and valued at $721,110 with a mortgage balance of $247,025; and (2) 20341 N.E. 30th Avenue, Apt PH-14 in Aventura, Florida (purchased in 1988 and valued at $199,515 with no mortgage). The trial court observed that Uliana testified that she did not want either property and Leonard offered no testimony in that regard. The trial court held that under paragraph 2 of the premarital agreement, jointly owned property was to be divided equally. The trial court awarded the Aventura property to Leonard and directed him to pay Uliana a 50% interest, or $99,757.50. It awarded Golden Isles to Leonard and ordered him to pay Uliana $237,042.50 (50% interest in the equity of $474,085).

¶ 64  The trial court determined that the following property was Uliana's separate non-marital property acquired during the marriage. It awarded her the Michigan residence she inherited from her mother under section 503(a)(1) of the Act and the premarital agreement, finding that it may have equity of $100,000, but this was unsubstantiated. The trial court awarded her all of the bank accounts that were held only in her name.

¶ 65  Additionally, the trial court found that the parties had two jointly held bank accounts at Bank of America which had negative balances. The trial court awarded them to Leonard without contribution from Uliana. Each party was awarded their respective automobiles. Leonard was

ordered to pay the outstanding balance of $2,766 on Uliana's credit card. The trial court found that Uliana had failed to provide any evidence that Leonard had dissipated any marital assets. The trial court also ordered that Uliana has no interest in the account related to the annual student course hosted by Neuro-Surgical as it was clear from Leonard's testimony that he took no income from the program and the accounts were controlled by and for the benefit of the course.

¶ 66    Regarding payments to Uliana, the trial court found that section 7 of the premarital agreement provided for a payment of $2,500 per month for 100 months as and for Uliana's waiver of maintenance and property claims. The trial court observed that at the time the parties executed the premarital agreement, the law examined whether the premarital agreement would leave a spouse in a state of penury in determining whether to enforce a maintenance waiver clause. The trial court found that Uliana had waived maintenance; the trial court's previous order for temporary monthly payments of $7,500 was intended to keep her out of a state of penury. The trial court ordered Leonard to pay Uliana $8,370 for 100 months beginning on April 15, 2018, as payments in lieu of maintenance and for her waiver of property claims. The court observed that they were not deductible to Leonard or includable in Uliana's taxable income. The court ordered Leonard to pay for Uliana's medical insurance premiums for three months.

¶ 67    Concerning attorney fees, the trial court ordered that each party shall pay their own fees, except for the $100,000 Leonard previously paid to Uliana's counsel. It observed that, as it had previously ordered on March 28, Uliana's petition for contribution to attorney fees and request for hearing were denied.

¶ 68                    F. Post Judgment Proceedings

¶ 69    Uliana filed a notice of appeal from the Supplemental Judgment (No. 1-18-0979). Leonard filed a petition for postjudgment enforcement and relief arguing that Uliana placed

CME distributions from their joint bank account into her own bank account following entry of the Supplemental Judgment and she refused to turn over keys to the Florida properties that Leonard was awarded. The trial court granted Leonard's motion on November 21, 2018. Uliana filed a notice of appeal from the November 21, 2018, order (No. 1-18-2493). While this appeal was pending, Leonard passed away.[3]

¶ 70                                     II. ANALYSIS

¶ 71                           A. Uliana's Petition for Contribution

¶ 72    1. Waiver/Invited Error

¶ 73        Uliana argues that her attorneys were owed contribution to attorney fees pursuant to section 503(j) and 508(a) of the Act (750 ILCS 5/503(j), 508(a) (West 2016)), and the trial court erred in refusing to hold a separate hearing on her petition for contribution. Before we discuss Uliana's substantive contentions, we first address Leonard's argument that Uliana waived any issues regarding contribution because her counsel invited the error and acquiesced to the trial court's refusal to hold a more formal hearing on contribution. Uliana counters that Leonard misquotes and misconstrues the record.

¶ 74        Having closely reviewed the record, we find that Uliana and her counsel did not invite error or waive objection to the trial court's decision not to hold a separate hearing on the petition for contribution. The record reflects that Uliana filed her petition for contribution, and Leonard moved to dismiss. The trial court set Leonard's motion for a hearing on March 28. When the parties appeared before the trial court on March 9, 2018, the court announced its oral ruling regarding the trial issues. Towards the end of this hearing, the trial court stated, "attorneys' fees, everybody pays their own fees from here on." Further, "I don't think that there is any—any

_____

[3] This court entered an order on August 8, 2019, that spread of record Leonard's death.

reason to disturb the fact that the $100,000 that was paid on attorneys' fees, I am not considering that at all. From now on, everybody pays their fees."

¶ 75      The parties reconvened on March 28, 2018, to address Leonard's motion to dismiss Uliana's petition for contribution, the petition for contribution to attorney fees filed by Uliana's previous counsel against both Uliana and Leonard, and Uliana's motion to vacate the Bifurcated Judgment. At the start of the hearing, Uliana's counsel objected that the trial court had already ruled on her petition for contribution orally on March 9, without first conducting a hearing under section 503(j). Counsel stated:

> "I just want you to understand that what we have before you is my client's contribution petition which you ordered be briefed and set a hearing—or didn't set a hearing yet, and a petition for contribution from former counsel *** . And also I understand in my absence after the ruling there's this rush to get the judgment to you to enter, but if we're going to have a contribution hearing, which you must do, then that has to be done before entry of the judgment, so under—under 503(j) I believe. So I don't know how you want to handle all this but that's my problem with this—with this appearance today."

¶ 76      Leonard's counsel argued that a contribution hearing was not required because the prenuptial agreement, which had been found valid and enforceable, required that any fees Leonard would be ordered to pay must be deducted from the sum of money Uliana receives under the judgment and prenuptial agreement.

¶ 77      Uliana's counsel reiterated that under section 503(j), a petition for contribution must be heard and decided before a final judgment is entered. Counsel pointed out that the court orally ruled on the issue three days after counsel submitted a more than 30-page brief on Uliana's

contribution request, which set forth numerous public policy issues, case law, and other reasons to grant contribution and find that the premarital agreement was unenforceable as to attorney fees. Counsel continued:

> "[Leonard's counsel] says that we can't pursue our fee claim because of the provisions in the prenuptial agreement; that's malarkey. He says we're not entitled to a hearing on—on contribution; that's malarkey. He says you don't have to hold a hearing; that's malarkey. You do have to hold a hearing and that hearing has to be held before you enter a judgment, and the point of the matter is we're entitled to it. Now, either you give us this hearing and you change this provision that she's responsible for all *** or you simply suggest that *** under the prenuptial we're not entitled to any fees because our—our argument that it's against public policies carries no weight at all with you, but whatever you do we need some direction from this Court."

¶ 78 Uliana's counsel suggested that the court could hear the petition and Leonard's motion to dismiss on the April date that was already set for hearing, or stand by its ruling and counsel would file a motion for stay and an appeal. Counsel stated that he had already incurred $500,000 in fees which Uliana did not have the money to pay, and counsel was "entitled to a contribution hearing. *** So give me a contribution hearing."

¶ 79 Following this argument, the trial court stated, "Okay. So the first thing I'm going to do is I'm going to say that the parties are to pay their own fees. *** I'm not retracting that." Uliana's counsel then clarified the issue with the court:

> "MR. GRUND: Judge, I want to clarify something. You're denying our right despite the mandate in 503(j) that you have to conduct a hearing on

contribution before you enter the judgment? You're denying our right to have that contribution hearing, correct?

THE COURT: I'm saying because I've listened to all the evidence, I went through all of the—the exhibits, I heard the arguments of counsel at trial, I reviewed your papers regarding, you know, the judgment, et cetera that—that both parties will pay their own fees.

MR. GRUND: I've got it—

THE COURT: --period.

MR. GRUND: Thank you.

THE COURT: You're welcome."

¶ 80 Leonard's counsel stated that in light of the trial court's ruling, he would withdraw his motion to dismiss Uliana's petition for contribution.

¶ 81 Uliana's counsel then asked the trial court about the status of her motion to vacate the Bifurcated Judgment that she filed in December 2017, as the trial court had not rendered a decision. The following colloquy occurred regarding Uliana's motion to vacate:

"THE COURT: Okay. So I'm familiar with everything in there. I'm denying your motion to vacate it.

MR. GRUND: What are you familiar with?

THE COURT: I'm familiar with the entire case, Mr. Grund. If you want to reargue it again how about if we do this --

MR. GRUND: You're sitting here--

THE COURT: -- set everything down for a hearing. Mr. Grund can argue

whatever he wants to argue at a hearing. Goodbye, guys. Get a hearing date.

MR. GRUND: On the motion to --

THE COURT: But I've denied – I have denied your motion to vacate it. Okay? And anything else you want to argue about or tell me you can do it at the hearing. I've got --

MR. GRUND: What hearing?

THE COURT: I've got a full courtroom.

MR. GRUND: What hearing are you talking about?

THE COURT: Pardon me?

MR. GRUND: What hearing are you talking about?

THE COURT: I'm saying --

MR. GRUND: If you denied it you denied it.

THE COURT: No. You were proceeding -- You kept proceeding in an argument so if you want to argue or continue we'll do it at a hearing or we'll do it at a time where, you know, I can take care of some other people in my courtroom.

MR. GRUND: There's nothing for me to argue, Judge.

THE COURT: Okay.

MR. GRUND: I was only seeking clarification from you --

THE COURT: Okay.

MR. GRUND: -- that's all.

THE COURT: All right. There you go.

> MR. GRUND: I want to make sure that -- that everybody understands what your orders are, that's it, Judge.
>
> THE COURT: Okay. Do you understand it --
>
> MR. GOLDMAN: Yes, I do, your Honor."

¶ 82　　On appeal, Leonard points to counsel's above statements that "[i]f you denied it you denied it" and "[t]here's nothing for me to argue, Judge," as evincing a waiver of Uliana's request for a hearing on the petition for contribution. However, Leonard takes these statements out of context. It is clear when viewing counsel's arguments and the trial court's statements in their entirety that neither the court nor Uliana's counsel was referring to the petition for contribution at that moment. Rather, they were discussing Uliana's motion to vacate the Bifurcated Judgment. Moreover, it is evident from the full colloquy on March 28 that Uliana's counsel steadfastly maintained his request for a contribution hearing before the trial court. We therefore conclude that no waiver or invited error occurred.

¶ 83　　2. Standard of Review

¶ 84　　Uliana asserts that the trial court's refusal to hold a separate evidentiary hearing on her petition for contribution under section 503(j) of the Act (750 ILCS 5/503(j) (West 2016)) presents an issue of law which we must review *de novo.* Leonard contends that the proper standard of review is an abuse of discretion.

¶ 85　　We find that a mixed standard of review is appropriate. The law is well settled that attorney fees are the primary obligation of the party for whom the services are rendered." *In re Marriage of Stufflebeam*, 283 Ill. App. 3d 923, 929-30 (1996). "The allowance of attorney fees in a dissolution of marriage proceeding and the proportion to be paid by each party are best left to the trial court's sound discretion and will not be disturbed on review absent an abuse of that

discretion." *Id.* at 930. That is, we analyze whether the trial court "acted arbitrarily without conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted." *In re Marriage of Suriano and LaFeber*, 324 Ill. App. 3d 839, 846 (2001). "When determining an award of attorney fees, the allocation of assets and liabilities, maintenance and the relative earning abilities of the parties should be considered. [Citation.] A party seeking an award of attorney fees must show that he or she is unable to pay those fees and the other party is able to do so." *Id.* at 852. For example, an abuse of discretion can be established if "the evidence reveals a gross disparity in income and earning capacity and the financial inability of the spouse seeking relief to pay." *Id.*

¶ 86     To the extent that our analysis requires interpretation or construction of section 503 or other provisions of the Act, this involves a question of statutory interpretation, which we review *de novo*. *Suriano*, 324 Ill. App. 3d at 846. In construing a statute, our primary objective is to give effect to the intent of the legislature, the most reliable indication of which is the plain and ordinary meaning of the statutory language. *Id.* We apply clear and unambiguous language as written. *Id.*

¶ 87     Similarly, to the extent that our analysis requires interpretation of their premarital agreement, we abide by the rules of contract interpretation. *In re Marriage of Best*, 387 Ill. App. 3d 948, 949 (2009). "Construction of a contract presents a question of law, subject to *de novo* review." *Id.* "A court must look to the language of the contract, given its plain and ordinary meaning, as the best indication of the parties' intent." *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 108. "[A] contract must be construed as a whole, viewing each part in light of the others." *Id.*

¶ 88    3. Refusal to Hold a Separate Evidentiary Hearing

¶ 89    Section 503(j) provides, in pertinent part:

>    "(j) After proofs have closed in the final hearing on all other issues
>    between the parties (or in conjunction with the final hearing, if all parties so
>    stipulate) and before judgment is entered, a party's petition for contribution to
>    fees and costs incurred in the proceeding *shall be heard and decided*, in
>    accordance with the following provisions." (Emphasis added). 750 ILCS
>    5/503(j) (West 2016).

¶ 90    Uliana contends that the phrase "shall be heard and decided" indicates the trial court must hold a separate hearing on contribution. She relies heavily on *In re Marriage of Brackett*, 309 Ill. App. 3d 329, 345 (1999), which held that, under section 503(j), "the trial court *must* hear and decide a party's petition for contribution to attorney fees and costs after the close of proofs on all other issues." (Emphasis in original). However, *Bracket* court further explained that it would "temper" this statement:

>    "by cautioning against too literal a reading of section 503(j). We do not read
>    section 503(j) as requiring an additional hearing, which would further burden
>    already overburdened trial courts, but, rather, as requiring a trial court to hear,
>    through testimony or otherwise, additional proofs when a petition for
>    contribution is filed in accordance with section 503(j) in the context of
>    preexisting proceedings. If the trial court wishes to hold a separate and distinct
>    hearing on the petition, it has the discretion to do so." *Id.*

¶ 91    In *In re Marriage of Suriano and LaFeber*, 324 Ill. App. 3d 839, 847 (2001), our court interpreted section 503(j) and found that it was clear and unambiguous in that this section

"neither makes provision for nor mandates an evidentiary hearing in connection with the circuit court's determination of the allocation of attorney fees and costs." *Id.* There, the trial court held a hearing wherein the parties argued at length about the allocation of assets and liabilities and the parties' earnings in the context of their cross-petitions for contribution. *Id.* at 848-49. Although the husband requested a separate evidentiary hearing and provided an offer of proof for additional evidence, our court held that "it was within the [trial] court's discretion whether to allow an additional, separate hearing." *Id.* at 849. "The plain and ordinary meaning of section 503(j) does not require a separate evidentiary hearing." *Id.* In *Suriano*, the trial court did not abuse its discretion in refusing to conduct an evidentiary hearing as it had provided the parties with a hearing where the parties were able to present their arguments. *Id.* Indeed, the *Suriano* court distinguished *Brackett* because in the latter, there was no indication that the trial court made a separate ruling on the petition for contribution and no evidence regarding the amount of attorney fees owed by the parties was presented at a separate hearing or during any of the proceedings. *Suriano*, 324 Ill. App. 3d at 348-49; *Brackett*, 309 Ill. App. 3d at 345-56.

¶ 92    Accordingly, we conclude that the trial court here was not required to hold a separate evidentiary hearing, beyond what it had already provided, concerning Uliana's petition for contribution. In contrast to *Brackett*, the record reflects that the trial court had before it ample evidence to consider Uliana's request for contribution and the parties were given the opportunity to present their respective arguments. Uliana's written petition for contribution set forth her arguments and detailed the amount of fees and costs she owed for the work her attorneys provided. Uliana asserted that as of February 2018, her attorneys were owed $474,997.43 and had advanced costs of $33,505.64, and Leonard had previously paid her law firm $100,000. Uliana asserted that given her poor health, lack of employment, lack of financial resources, and

Leonard's financial position, the court should order Leonard to pay Uliana's attorney fees and costs. Further, Leonard's motion to dismiss her petition called into question whether her requested fees included matters for which she was not entitled to any fees, such as her prior appeal and voluntarily dismissed divorce petition, and whether the amount of fees she claimed was reasonable given that her total fees were well over $600,000, whereas Leonard's fees and costs totaled $189,887.12 through February 14, 2018. Leonard also argued that the fee provision of the premarital agreement required that any attorney fees paid by Leonard were to be included in the total amount he was obligated to pay under the agreement and not in addition to it. In response, Uliana clarified that she was not requesting fees related to her prior appeal.

¶ 93    Thus, when court convened on March 9 and 28, 2018, it had all of the pertinent arguments and evidence before it, in addition to the trial evidence previously presented regarding the parties' financial positions. Uliana's counsel also presented further argument at that time on the petition. When the trial court again denied her request for contribution on March 28, it specifically stated that it had considered all of the evidence and the parties' arguments, reviewed the exhibits and briefs, and considered the judgment. The lack of a separate evidentiary hearing was not dispositive here, as the trial court abided by the requirements of section 503(j) and fully considered the issue with the relevant arguments and evidence sufficiently before it. See *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 623 (2004) ("The lack of a hearing here is not dispositive. The assets and liabilities of the two parties were before the court already, as was the amount of Pamela's attorney fees. We fail to see what other evidence had to be presented for the court to rule on Pamela's request.").

¶ 94    4. Determination that Each Party Would Pay Their Own Fees

¶ 95        Uliana argues, alternatively, that the trial court abused its discretion in denying her petition for contribution because requiring each party to pay their own fees would place her in a position of penury.

¶ 96        Under the Act, a trial court "may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 735 ILCS 5/508(a) (West 2016). "[C]ontribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503[.]" 735 ILCS 5/508(a) (West 2016). Section 503(j) provides that a contribution award is based on the criteria for the division of marital property outlined in subsection 503(d) (750 ILCS 5/503(d) (West 2016)), and, if maintenance is awarded, contribution is based on the criteria for a maintenance award under section 504(a) (750 ILCS 5/504(a) (West 2016)). 750 ILCS 5/503(j) (West 2016).

¶ 97        Section 503(d) lists the following factors for the court to consider: (1) each party's contribution to the value of the marital estate; (2) dissipation of the marital estate by each party; (3) the value of the property assigned to each party; (4) the length of the marriage; (5) the economic circumstances of each party; (6) obligations or rights arising from a prior marriage of either party;  (7) any premarital or postnuptial agreements between the parties; (8) each parties' age, health, occupation, income, employability, and liabilities; (9) any custodial provisions for children; (10) whether maintenance was awarded; (11) each party's opportunity for future income; (12) the tax consequences of the property division on each party. 750 ILCS 5/503(d) (West 2016).

¶ 98        Additionally, the following factors in section 504(a) become relevant where maintenance is awarded: (1) each party's income and marital property; (2) each party's needs; (3) earning capacity; (4) any impairment to earning capacity due to a party having forgone employment or

education for the marriage; (5) impairment of earning capacity of the party against whom maintenance is sought; (6) the time required for the party seeking maintenance to acquire education or employment; (7) the parties' standard of living during marriage; (8) the duration of the marriage; (9) each parties' age, health, occupation, income, employability, and liabilities; (10) all sources of income; (11) tax consequences; (12) the party's contributions to the education or career of the other spouse; (13) any valid agreement between the parties; and (14) any other factors the court finds just and equitable. 750 ILCS 5/504(a) (West 2016).

¶ 99      Leonard argues that the paragraph 7 of the premarital agreement mandates that any amounts Leonard pays for Uliana's attorney fees must be deducted from the payments in lieu of maintenance that he was ordered to pay to Uliana. Leonard also argues the trial court's decision was not an abuse of discretion because Uliana had the financial resources to pay her attorney fees considering the amounts she was awarded under the Supplemental Judgment, and she has a college degree and experience managing Leonard's properties, and thus has the ability to work. Leonard asserts that her claimed attorney fees and costs of over $500,000 are unreasonable. Leonard further contends that Uliana is not entitled to contribution for fees related to anything but the current divorce proceedings because she voluntarily dismissed her divorce case, the declaratory judgment action related to that case, and she was unsuccessful on all issues in her appeal.

¶ 100      Both sections 503(d) and 504(a) permit a trial court to consider any valid premarital agreements between the parties when determining whether to order a spouse to contribute to the other spouse's attorney fees. 750 ILCS 5/503(a) (West 2016); 750 ILCS 5/504(a) (West 2016). Paragraph 7 of the parties' premarital agreement sets forth a schedule of payments related to the length of the parties' marriage. Subsection (f) provides that if either party filed for dissolution of

marriage, Leonard must pay to Uliana "as and for a lump sum settlement in lieu of and instead of maintenance *** and in lieu of and instead of any and all property rights" $2,500 for 100 months because they were married for more than 240 months. Further, paragraph 7 provides that Leonard's obligation to pay support and maintenance is limited to the amount specified in the applicable subsection (f) and that "the aggregate of all such obligations of LEONARD for the payment to ULIANA of alimony, support, and maintenance or alimony in gross or attorneys' fees shall not exceed whichever of the sums in the said subsections, above, shall be applicable."

¶ 101    Thus, the language in paragraph 7 of the premarital agreement does not prohibit the trial court from ordering Leonard to contribute to Uliana's attorney fees. However, paragraph 7 requires that the sum of any amounts that Leonard is be ordered to pay Uliana—whether in temporary spousal support, maintenance, *or attorneys' fees*—does not exceed the sum in the applicable subsection, which in this case was subsection (f) because the parties were married for more than 240 months. Subsection (f) called for Leonard to pay Uliana $2,500 per month for 100 months, or $250,000 total. Thus, under their premarital agreement, any amounts Leonard was ordered to pay for attorney fees or temporary support should be deducted against this total obligation under the terms of paragraph 7.

¶ 102    In fact, the trial court departed from the terms of the premarital agreement because it ordered Leonard to pay Uliana temporary support payments of $7,500 during the pendency of the divorce and it ordered him to contribute an additional $100,000 toward her interim attorney fees when he sold a piece of marital property. However, the trial court did not credit these amounts against his total obligation of $250,000 under paragraph 7. Additionally, the trial court ultimately ordered Leonard to pay Uliana $8,370 monthly for 100 months ($837,000 total - without termination at Leonard's death) starting from the date the Supplemental Judgment was

entered, and provided no credit against this obligation for the amounts Leonard previously paid in temporary support or interim attorney fees. Thus, the amounts Leonard was ordered to pay already vastly exceeded his total obligation of $250,000 under the agreement, even without considering any amount for contribution that Uliana sought toward her $500,000 attorney fee bill. It cannot be understated that, although the trial court denied Uliana's contribution petition, it ultimately left Uliana in markedly better position than the premarital agreement provided for. We additionally observe that Uliana was also awarded $336,800 for her interest in the parties' Florida real estate, her home in Michigan, and other financial accounts. The record also supports that in making this determination, the trial court heard extensive argument from the parties on the issue of contribution and had before it all the relevant written briefs, documents, and evidence to consider the relevant factors under section 503(j). The court heard trial evidence regarding Uliana's financial status, age, health conditions, living expenses, and employment prospects, in addition to Leonard's financial situation.

¶ 103      Additionally, while section 503(j) does not expressly require a trial court to consider the necessity of a party's attorney fees, this section does incorporate a reasonableness requirement. *Nesbitt*, 377 Ill. App. 3d at 657-58. As noted, Uliana claimed to have incurred well over $600,000 total in legal fees during the course of proceedings, whereas Leonard incurred $180,000. The trial court had already ordered Leonard to contribute $100,000 to Uliana's legal fees and circumvented the premarital agreement in awarding monthly payments at a greater amount than specified by the agreement and not subtracting any amounts previously paid by Leonard against this obligation. Under the circumstances, we find no abuse of discretion in the trial court's decision that no further contribution to attorney fees was warranted.

¶ 104                                    B. Maintenance

¶ 105     Uliana next contends that the trial court erred in construing the premarital agreement as constituting a waiver of her right to maintenance. Uliana argues that the only provisions in which the term "waiver" appears are those dealing with spousal rights upon death of the other spouse, such as paragraphs 4 and 5. Uliana argues that paragraph 7, which discusses maintenance and property rights, does not contain express waiver language. She further asserts that it would be against public policy to construe paragraph 7 as releasing her future rights to maintenance and property upon divorce because these were unknown and not specifically contemplated at the time they executed the premarital agreement.

¶ 106     Leonard argues that Uliana is prohibited from relitigating the issue of interpretation of the property classification and maintenance waiver provisions in the premarital agreement. Leonard contends that the law-of-the-case doctrine precludes Uliana from arguing that the premarital agreement did not waive maintenance and property rights because in her prior appeal, she argued at length regarding interpretation of the agreement in asserting that it was unconscionable and not reasonable on these grounds. Leonard argues that resolution of her issues required interpretation of the agreement, and was thus a necessary component of Uliana's prior appeal and this court's prior analysis. He also claims that she conceded in her prior appeal and in her trial briefs that she waived her right to maintenance and property rights under the terms of paragraph 7 and she has waived her right to assert the opposite in this appeal.

¶ 107     Uliana responds that the law-of-the-case doctrine does not bar her arguments here because the issues litigated in the prior case concerned the validity and enforceability of the premarital agreement, whereas the issues in the present case concern the construction and application of the premarital agreement to the parties' property. She denies that she previously

conceded that she waived maintenance or property rights under the terms of the premarital agreement.

¶ 108     "A trial court enjoys considerable discretion in granting maintenance; we will not reverse absent an abuse of discretion." *Brackett*, 309 Ill. App. 3d at 340. As stated, premarital agreements are governed by the rules of contract interpretation, and we review their construction *de novo* on appeal. *Best*, 387 Ill. App. 3d at 949. We view the agreement in its entirety, giving words their plain and ordinary meaning in order to best arrive at the party's intent. *Woodrum*, 2018 IL App (3d) 170369, ¶ 108.

¶ 109     We first examine Leonard's argument that the law-of-the-case doctrine precludes Uliana's argument. "The law-of-the-case doctrine provides that 'where an issue has been litigated and decided, a court's unreversed decision on that question of law or fact settles that question for all subsequent stages of the suit.' " *Underwood v. City of Chicago*, 2020 IL App (1st) 182180, ¶ 38 (quoting *Alwin v. Village of Wheeling*, 371 Ill. App. 3d 898, 911 (2007)). Issues decided by this court in an initial appeal are usually not subject to re-consideration in a second appeal. *Id.* "The extent to which this doctrine applies here is an issue of law we review *de novo*." *Id.*

¶ 110     In the prior case, the trial court granted Leonard's request for declaratory relief in finding, *inter alia*, that the premarital agreement was valid based on its determination that it was fair and reasonable and was not the product of fraud, duress, or coercion. *Kranzler*, 2018 IL App (1st) 171169, ¶ 34. In her appeal of that order, Uliana raised the following contentions before this court: (1) the trial court lacked subject matter jurisdiction over Leonard's motion for declaratory relief; (2) the trial court erred in applying the Illinois Uniform Premarital Agreement Act (750 ILCS 10/101 *et seq.*) to the premarital agreement and not concluding that it created an

unforeseen condition of penury; (3) the trial court erred in finding that the premarital agreement was not the product of duress or undue influence; (4) the trial court erred in finding the premarital agreement was not unfair or unreasonable; (5) the trial court erred in finding that the premarital agreement was not unconscionable. *Id.* ¶¶ 41, 59, 68, 77, 87, 94.

¶ 111        On appeal, this court held, *inter alia*, that under the applicable legal standard, the agreement was valid because it did not leave Uliana in a state of penury. In reaching this conclusion, this court observed that under the terms of the agreement, Uliana was entitled to "a monthly payment in maintenance" based on the length of the parties' marriage, that she would receive all property in her name, half of all marital property, and 40% of Leonard's net estate upon death. *Kranzler*, 2018 IL App (1st) 171169, ¶ 72. The court concluded that the trial court's factual determinations were not manifestly erroneous in finding that the agreement did not create an unforeseen condition of penury and was fair and reasonable considering "the parties' age difference, the maintenance provision and the estate provision, and the fact that they may have contemplated a short marriage." *Id*. ¶ 74. Additionally, this court held that the trial court did not err in finding the agreement fair and reasonable because it "did not leave Uliana without a financial settlement and did not involve a complete waiver of maintenance. She was entitled to receive $2,500 per month for 100 months ***. In addition, she retains her property in Michigan ***, and all other premarital property. She is also entitled to half of all jointly titled marital property upon resolution of the dissolution case." *Id*. ¶ 91. For similar reasons, this court found the agreement was not unconscionable. *Id.* ¶ 96.

¶ 112        Based on the foregoing, we find that this court necessarily interpreted the provisions of the premarital agreement in reaching its conclusion that it was a valid, enforceable agreement in Uliana's prior appeal. The law-of-the-case doctrine " 'encompasses a court's *explicit decisions*

and issues decided by *necessary implication*.' " *Underwood*, 2020 IL App (1st) 182180, ¶ 50 (quoting *Reich v. Gendreau*, 308 Ill. App. 3d 825, 829 (1999)). Under the applicable law as it stood at the time the parties executed the agreement here, premarital agreements "determining the rights of spouses to property *** or maintenance *** are valid and enforceable so long as (1) an unforeseen condition of penury is not created due to lack of property resources or lack of employability [citation], (2) the agreement is entered into with full knowledge and without fraud, duress, or coercion [citation], and (3) the agreement is fair and reasonable." *Warren v. Warren*, 169 Ill. App. 3d 226, 230 (1988). As such, the inquiry into whether a premarital agreement is fair and reasonable requires construction of its provisions in order to ascertain whether it "guarantee[s] both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance." *Id.* at 231. While the prior appeal did not involve actual application of the premarital agreement to the parties' current divorce, it did require the court to construe the terms of the agreement to the extent necessary to address her issues on appeal. That is, in order to decide Uliana's challenge that the premarital agreement was not fair or reasonable and that it was unconscionable, the court necessarily had to determine what rights she was waiving and what benefits she was entitled to under its provisions.

¶ 113     Although Uliana contends that she did not previously concede that she waived maintenance or property rights under the terms of the premarital agreement, we disagree. In her brief on appeal in the prior case, she asserted several times that the premarital agreement was not fair or reasonable and was substantively unconscionable because, in it, she waived her maintenance and property rights:

> "Under the Antenuptial Agreement (assuming, arguendo, it were somehow enforceable), Uliana waived all interest in the property owned by Leonard

- 33 -

before the parties' marriage and \*\*\* all of his income and property acquired after their marriage. \*\*\* The only thing that the ailing Uliana will be entitled to \*\*\* is 100 months \*\*\* of monthly taxable maintenance of $2,500 ($30,000 per year)[.] \*\*\* [T]he total amount that Uliana can receive from Leonard under the Antenuptial Agreement is capped at $250,000, and subtracted from that cap is any temporary maintenance paid to Uliana and any attorney fees paid by Leonard to Uliana's counsel. And what did Uliana give up for those crumbs? Uliana gave up any marital claim to the millions of dollars to Leonard's estate and her right to permanent statutory maintenance." (Emphasis omitted.)

¶ 114    Uliana reiterated this argument throughout her brief. (Appellant's Br., Docket No. 1-17-1169 at 31, 41, 48). Uliana relies on her prefacing these arguments with the following qualification: "assuming, *arguendo*, [the premarital agreement] were somehow enforceable," to assert that she did not concede that she waived maintenance and property rights. However, this statement merely indicates that for purposes of argument, she was assuming the agreement was enforceable.

¶ 115    Alternatively, even if we were to agree with Uliana that the prior appeal did not determine whether she waived maintenance and property rights under the premarital agreement, we would disagree with her proposed construction of those provisions in this appeal. As Leonard argues, Uliana's interpretation of the agreement leads to an absurd result. Under Uliana's construction, she would receive a better recovery in divorce than in Leonard's death, that is, she would receive the payments "in lieu of maintenance" under paragraph 7, *in addition to* a separate right to maintenance and property rights under the law.

¶ 116    We conclude that, by its plain terms, paragraph 7 of the premarital agreement waived Uliana's maintenance and property rights. As previously noted, paragraph 7 provides:

"7. That in the event that either of them shall at any time hereafter file legal proceedings for dissolution of marriage or for legal separation, LEONARD shall pay to ULIANA, *as and for a lump sum settlement in lieu of and instead of maintenance (formerly known as alimony), whether past, present or future, and in lieu of and instead of any and all property rights whether past, present or future, whether marital or non-marital*, ULIANA may claim or assert against LEONARD, the following:

***

(f) In the event that the parties shall have been married for more than 240 months prior to the filing of a Petition for Dissolution of Marriage or of a Petition for Legal Separation by either party, LEONARD shall pay to ULIANA the sum of $2,500.00 each month for the 100 months immediately following the filing of such petition.

The aforesaid lump sum settlement set forth in (a) through (f), above shall be defeasible and terminate forever upon the first to happen in point of time of the following events:

(i) ULIANA's remarriage or death,

(ii) LEONARD's death, or

(iii) the full payment of the applicable amount in (a) through (f), whichever shall be applicable, by LEONARD to ULIANA.

The parties further covenant and agree that in the event either party shall obtain a Judgment for Dissolution of Marriage or a Judgment for Legal Separation, *any amount paid by LEONARD to ULIANA during the pendency of such proceedings shall be included in, and shall not be in addition to, the lump sum settlement in lieu of maintenance and property rights hereinabove provided.* The parties further covenant and agree that *the obligation of LEONARD to pay support and maintenance to ULIANA, whether temporary or permanent, shall be limited to whichever of the amounts hereinbefore specified in subsections (a)—(f) of this paragraph shall be applicable*, regardless of the number of legal proceedings commenced by either party, and that *the aggregate of all such obligations of LEONARD for the payment to ULIANA of alimony, support, and maintenance or alimony in gross or attorneys' fees shall not exceed whichever of the sums in the said subsections, above, shall be applicable.*" (Emphasis added.)

¶ 117 The language of paragraph 7 plainly states that the payments by Leonard set forth in that section shall be "as and for a lump sum settlement *in lieu of and instead of maintenance* (formerly known as alimony), whether past, present or future, and *in lieu of and instead of any and all property rights* whether past, present or future, whether marital or non-marital." Paragraph 7 continues on to state, twice, in various terms that any additional amounts Leonard is ordered to pay to Uliana in the event of dissolution, such as temporary or permanent support or legal fees, "shall be included in, and shall not be in addition to, the lump sum settlement in lieu of maintenance and property rights hereinabove provided."

¶ 118      It is also clear from other provisions of the premarital agreement that the parties specifically contemplated the waiver of spousal maintenance and property rights at the time the parties contracted. For example, the opening recitals indicate that its provisions were intended to govern their rights in the event of both death and divorce and maintain their respective property and incomes:

> "WHEREAS, the parties hereto are desirous of maintaining their respective properties and incomes for the benefit of themselves and their families, and
>
> WHEREAS, it is the desire of the parties hereto to set forth in writing the terms and conditions governing the respective rights of each in the event of the death of either party or in the event of the filing for and entry of a Judgment for Dissolution of Marriage or the filing for and entry of a Judgment for Legal Separation[.]"

¶ 119      Although recitals to a contract are "not [an] operational part of [a] contract between the parties, they reflect the intent of the parties and influence the way the parties constructed the contract." (Internal quotation marks and citations omitted.) *Hagene v. Derek Polling Const.*, 388 Ill. App. 3d 380, 385 (2009). "The contract recitals create a context through which the operational portion of the contract can be better understood, because they indicate the relevant circumstances to its execution." *Id.*

¶ 120      Contrary to Uliana's argument, we do not find that other provisions change our interpretation of the plain language of paragraph 7. Rather, consistent with the recital paragraphs and paragraph 7, paragraphs 1, 2, 3, and 4 reinforce the idea that, in the event of divorce or death, the parties intended to retain their own property and incomes acquired before and during

the marriage, unless specifically held jointly. Paragraph 1 provides, in relevant part, that property acquired by the parties prior to marriage "shall remain his or her separate property *** in the event of a termination of the marriage by death, divorce or dissolution or marriage." Paragraph 2 provides, *inter alia*, that any jointly owned property "shall, upon the termination of the marriage by divorce or dissolution or marriage, be divided equally between the parties" or pass to the other upon death. Paragraph 3 states that, upon death, each party may dispose of their estates "as they desire" except as otherwise provided in the agreement. Further, in paragraph 6, Leonard devises a certain percentage of his net estate to Uliana according to the length of the marriage.

¶ 121        As to paragraph 4, Uliana argues that this provision contains express waiver language but does not specifically mention divorce or dissolution and, thus, when read with paragraph 7, demonstrates that Uliana was not waiving her maintenance or property rights in the event of divorce. Paragraph 4 provides:

> "That, except as is otherwise provided in this Agreement, ULIANA shall, and does hereby waive, remise and release unto LEONARD and to his heirs, executors, administrators and assigns any and all claim of right, title or interest which she now has, or might hereafter assert, in and to all and singular the income and property of LEONARD, whether real, personal, or mixed, of whatsoever nature and wheresoever situated, *by reason of the marital relationship contemplated to exist between them*, including, *but not limiting the generality of the foregoing*, heirship, homestead, administration or renunciation of any Last Will and Testament, or codicil thereto, left by LEONARD, *and any and all other rights as spouse of LEONARD in and to his property or income*, *whether such property be now owned or shall be*

*hereafter acquired by him.* ULIANA further covenants and agrees that LEONARD may dispose of all and singular his estate and property, whether real, personal, or mixed, of whatsoever nature and wheresoever situated, by deed, conveyance, mortgage or other encumbrances, or trust, whether *inter vivos* or testamentary, or by Last Will and Testament, in such manner as he may desire, and that she will not in any manner interfere with or impede any transaction by him had in connection therewith and in fact she will execute any and all documents necessary and proper to effect such transaction."[4] (Emphasis added.)

¶ 122    We find that the language of paragraph 4 is not explicitly limited to apply only to Uliana's rights to Leonard's income and property at death, as it explicitly states, "*not limiting the generality of the foregoing.*" While some of the listed interests refer to estate matters, the provision specifically notes that this was "not limit[ed] to the generality of the foregoing." Further, if paragraph 4 was limited to waiver of estate claims, this would render paragraph 3 surplusage. Moreover, in light of the broader waiver of rights contained in paragraph 4, it is reasonable that paragraph 7 contains a more specific provision regarding payments in lieu of maintenance and property rights pertaining to divorce, just as paragraph 6 contains a more specific provision related to leaving Uliana a portion of Leonard's net estate according to the length of the marriage.

¶ 123    We are similarly unpersuaded by Uliana's citation to *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 286 (2003), where our supreme court found that a general-release clause in a marital settlement agreement did not bar the wife's claim against the husband for intentional inflict of

---

[4] Similarly, paragraph 5 effectuates a *verbatim* release by Leonard as to Uliana.

emotional distress. While recognizing that such contractual releases cannot be construed to release future claims that are not contemplated at the time an agreement is executed, the waivers in the parties' premarital agreement here were much more specific in nature and it was clearly within the contemplation of the parties to waive maintenance and property rights in the event of divorce. The premarital agreement demonstrates this in its overall structure and, more specifically, in its recitals and paragraph 7. And, as noted, the trial court awarded Uliana payments far in excess of what the agreement provided for under this schedule.

¶ 124                                  C. Non-Marital Property Division

¶ 125        Uliana next claims that the trial court erred in classifying certain assets as Leonard's non-marital property.

¶ 126        We review a trial court's ultimate distribution of marital property for an abuse of discretion. *In re Marriage of Polsky,* 387 Ill. App. 3d 126, 135 (2008). "An abuse of discretion is found only when no reasonable person would take the view adopted by the trial court." *Id.* Additionally, the trial court's classification of property as marital or non-marital will not be disturbed unless it is contrary to the manifest weight of the evidence, as this determination rests largely on the trial court's assessment of the credibility of the witnesses. *In re Marriage of Hubbs,* 363 Ill. App. 3d 696, 700 (2006). "A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Levinson,* 2012 IL App (1st) 112567, ¶ 33. As previously noted, interpretation of a premarital agreement is reviewed *de novo* and is governed by the laws of contract interpretation, the primary objective being to ascertain and effectuate the intent of the parties based on the plain and ordinary meaning of its terms. *Woodrum*, 2018 IL App (3d) 170369, ¶ 108; *Best*, 387 Ill. App. 3d at 949.

¶ 127    The Illinois Marriage and Dissolution of Marriage Act defines marital property as "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," except various enumerated exclusions which are deemed non-marital property. 750 ILCS 5/503(a) (West 2016). The Act creates a presumption that property acquired by either spouse after marriage is presumed marital property, regardless of the manner in which the property is titled. 750 ILCS 5/503(b)(1) (West 2016); *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 670 (2008). The party claiming that such property is non-marital bears the burden of rebutting this presumption by clear and convincing evidence. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 51.

¶ 128    Uliana asserts that the trial court disregarded the presumption that property acquired after marriage is marital property and that Leonard failed to present any evidence, let alone clear and convincing evidence, that various financial and real estate assets he acquired in his name where premarital or traceable to premarital assets listed on Exhibit B to the premarital agreement.

¶ 129    Leonard responds that under the terms of the premarital agreement, he was not required to demonstrate that the challenged assets were acquired before marriage or traceable to premarital property or otherwise prove additional exceptions under section 503(a) by clear and convincing evidence. Rather, he only had to show that they were titled in solely his name, which Uliana did not dispute.

¶ 130    In executing a premarital agreement, parties may agree that their "rights at dissolution are no longer governed by statute to the extent that they are validly modified or waived in their agreement." *Best*, 228 Ill. 2d at 118. This includes the ability of the parties to agree in a premarital contract that property acquired after marriage shall not become marital property. Subsection 503(a)(4) excludes from marital property any property that is acquired after marriage

but is "excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement." 750 ILCS 5/503(a)(4) (West 2016). See *Woodrum*, 2018 IL App (3d) 170369, ¶ 104 (finding that all of the property the parties acquired after their marriage was non-marital property and was excluded from becoming marital property by their prenuptial agreement under section 503(a)(4)).

¶ 131    The parties' disagreement centers on paragraph 4. Uliana reiterates her stance that paragraph 4 applies only to estate matters, not divorce. Leonard takes the position that paragraphs 4 and 5, which mirror each other, contain broad waivers by each party to the other party's income and property, which includes in the event of divorce.

¶ 132    As we previously explained, contrary to Uliana's assertion, the plain language of paragraph 4 is not confined solely to estate matters. As stated, paragraph 4 provides that Uliana waives any claim of right or interest in Leonard's income or property "by reason of the marital relationship contemplated to exist between them, including, but not limiting the generality of the foregoing *** and any and all other rights as spouse of LEONARD in and to his property or income, whether such property be now owned or shall be hereafter acquired by him." This effectuates a release by Uliana to waive any claim to Leonard's income or property that arose by reason of the marriage. Clearly encompassed within this language are assets owned by Leonard in his name only and acquired after marriage. In paragraph 4, Uliana further agrees that Leonard "may dispose of all" of all of his property "by deed, conveyance, mortgage or other encumbrances *** in such manner as he may desire," and she will not interfere. This second sentence lends further credence to the idea that paragraph 4 contains a broad waiver applicable outside of estate matters; Uliana agreed that Leonard can dispose of any of his property as he

desires by various measures—including deed, conveyance, mortgage, or other encumbrances— which are means of disposing of property other than estate measures.

¶ 133     As we explained, *supra*, we must view paragraph 4 in the context of the agreement's other provisions (*Woodrum*, 2018 IL App (3d) 170369, ¶ 108), and the waivers in this paragraph are necessary to carry out the premarital agreement's other provisions. As noted, the parties agreed in paragraph 1 that any property owned in their individual names acquired prior to marriage "shall remain his or her separate property" after marriage and in the event of divorce or death, except as otherwise provided. The parties agreed in paragraph 2 that property "now owned as separate property" prior to marriage that is transferred into joint ownership after marriage, or property that is acquired after marriage and held by both parties "shall, upon the termination of the marriage by divorce or dissolution of marriage, be divided equally between the parties, or shall, upon the death of one of the parties, pass and be taken by the other as survivor or beneficiary." In paragraph 3, the parties agreed that, except as otherwise provided in the premarital agreement, the parties "may dispose of their respective estates as they desire."

¶ 134     Thus, under the premarital agreement, any property owned by the parties before marriage remains that party's separate non-marital property in the event of divorce. Any property owned separately and transferred into joint ownership after marriage or any property acquired after marriage that is titled in both parties' names is classified as marital property and is to be divided equally between them in the event of divorce. The premarital agreement provides that only jointly owned property is divisible between the parties upon divorce. As such, the premarital agreement excludes from its of property divisible in divorce in paragraph 2 any property that is acquired after marriage but titled in only one spouse's name. "A well-known rule of statutory construction provides that *expressio unius est exclusio alterius,* the expression of one thing in a

statute excludes all others." *In re Commitment of Weekly*, 2011 IL App (1st) 102276, ¶ 40. This construction also comports with paragraph 4, in which Uliana waives any claim of right to Leonard's income or property that arose by reason of their marriage, whether that property "be now owned or shall be hereafter acquired by him."

¶ 135    Accordingly, in order for the trial court abide by the terms of the parties' valid premarital agreement and properly classify the parties' assets thereunder, it had to determine title or ownership of the property. The premarital agreement lists only jointly owned property as divisible between them in the event of divorce. The trial court correctly found that each party had waived his or her rights to property individually owned by the other, including property acquired during the marriage. We now turn to the specific assets Uliana challenges in her appeal.

¶ 136                                    1. CME Stock

¶ 137    Uliana argues that the trial court erroneously concluded that Leonard's IOM seat was transferred into 30,049 shares of CME stock and was thus Leonard's property prior to marriage. She contends that the CME stock was worth $4.9 million in March 2018 and was not acquired in exchange for the IOM seat that Leonard owned prior to marriage. Rather, Uliana argues that the CME stock was established and funded during the marriage.

¶ 138    Leonard argues that the evidence established that the CME stock was titled in his name only, as his 2014 Form 1099 for the stock was introduced at trial. He further notes that the IOM seat was listed in Exhibit B to the premarital agreement as his premarital property, and he testified at trial that the CME stock came from his ownership interest in the IOM seat.

¶ 139    We find no error in the trial court's decision to award the CME stock to Leonard. At trial, Leonard testified that the 2014 Form 1099 showed the distributions or dividends he received as a result of his CME stock ownership. He testified that he owned the IOM seat before marriage.

When asked whether he understood what the "participating share units" of 30,049 meant on the Form 1099, Leonard testified, "I think that's the shares that the seat is transferred into." He affirmed that he received 30,049 shares in 2004. The trial court credited Leonard's testimony in that regard. We find that whether the stock originated from the IOM seat that he owned before the marriage, or Leonard came into ownership of the CME stock after marriage by some other means, it was indisputably his property under the premarital agreement because it was owned solely in his name. There was no evidence that Uliana ever owned any shares or interest. Although Uliana also faults the trial court for not valuing this asset, we note that the trial court acknowledged Uliana's contention that it had great value. However, the exact value was irrelevant to the trial court's classification and division of this property under the terms of the premarital agreement.

¶ 140                                    2. Retirement Accounts

¶ 141        Uliana next challenges the trial court's determination to award Leonard his various retirement accounts. However, the only account that she specifically discusses is his Pershing Lodestar IRA. She contends Leonard failed to show that it was converted from his Neuro-Surgical pension plan, as he could not recall when this rollover occurred or trace assets from one account to another. She argues that he also attributed the Pershing Lodestar IRA's $2.4 million increase in value from the $800,000 initially rolled over to merely "appreciation."

¶ 142        We find no error in the trial court's decision to award Leonard the Pershing Lodestar IRA. The Neuro-Surgical pension plan was listed on exhibit B to the premarital agreement as his premarital property. Further, Leonard testified that his pension plan from Neuro-Surgical was rolled over into the Pershing Lodestar IRA. The trial court held that under paragraph 4, the Pershing Lodestar IRA was Leonard's sole property because it was held solely in his name.

There was no evidence that Uliana held any ownership interest or joint title in this asset with Leonard. We defer to the trial court's assessment of the evidence and witness credibility.

¶ 143                                3. Life Insurance Policy

¶ 144        Uliana also argues that the trial court erred in assigning to Leonard his AXA life insurance policy because Leonard failed to provide sufficient evidence tracing it to premarital property. However, the trial exhibit relating to this asset demonstrated that Leonard was the insured and owner of the insurance policy. Uliana did not provide any evidence to contradict Leonard's testimony that he had one life insurance policy that he obtained before marriage which had a cash value of $183,000 or to contradict his ownership of the AXA policy or show she had an ownership interest in it. Pursuant to paragraph 4 of the premarital agreement, Uliana waived any claim to this policy as it was held solely by Leonard.

¶ 145                                4. Real Estate

¶ 146        Uliana's final contention relates to real estate awarded to Leonard as separate property that was acquired during the marriage.[5] Although she fails to address each specific property or offer further analysis, she contends, as before, that Leonard failed to show by clear and convincing evidence that this real estate was acquired by Leonard through a method that would render it non-marital property under section 503(a). As stated, however, Leonard was not required to provide evidence tracing these assets to premarital property. Rather, he had to establish that it was held or owned only in his name and not jointly. The documentary and testimonial evidence that was introduced at trial showed that these real estate assets were titled solely in Leonard's name, and this evidence was unrefuted. We therefore find no error in the trial court's decision to award this property to Leonard.

---

[5] 2716 Sherwin Avenue, Chicago, Illinois; 1410 N. State Parkway, Unit 12 B, Chicago, Illinois; vacant land in Bozeman, Montana; and; 3150 N. Lake Shore Drive, Units 35D & 36A, Chicago, Illinois.

¶ 147                                    III. CONCLUSION

¶ 148          For the reasons stated, we affirm the Supplemental Judgment of the circuit court of Cook

County.

¶ 149          Affirmed.